1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID MCDANIEL, | Case No.  1:20-cv-00856-NONE-SAB |
| Plaintiff, | FINDINGS AND RECOMMENDATIONS RECOMMENDING GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS |
| v. | |
| RALPH DIAZ, et al., | (ECF No. 34) |
| Defendants. | OBJECTIONS DUE WITHIN FOURTEEN DAYS |

**I.**

**INTRODUCTION**

David McDaniel ("Plaintiff" or "McDaniel") filed this civil rights action pursuant to 42 U.S.C. § 1983.  (ECF No. 1.)  Currently before the Court is a motion to dismiss filed by Defendants Jeff Dirkse, Henry Mendez, and Jose Sousa, which was referred to a United States Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 302.  (ECF No. 30.)  The Court held a hearing on the motion on December 9, 2020.  Having considered the moving, opposition and reply papers, the declarations and exhibits attached thereto, the arguments presented at the December 9, 2020 hearing, as well as the Court's file, the Court issues the following findings and recommendations recommending that the motion to dismiss be granted in part and denied in part.

## II.

## BACKGROUND

### A.    Factual Allegations Contained in the Operative Complaint

Plaintiff's claims stem from allegations that he was supposed to be released from imprisonment on December 13, 2019, however, Plaintiff was instead held in custody until January 7, 2020, despite the protests by Plaintiff and his counsel.  (Second Amended Complaint ("SAC") ¶ 4-5, ECF No. 31.)[1]

Plaintiff was initially arrested in connection with Stanislaus County Superior Court case number 1480530 on October 31, 2014.  (SAC ¶ 20.)  On February 16, 2016, Plaintiff was charged by information in Stanislaus County Superior Court case number 1480530 with ten counts alleging robberies in violation of California Penal Code § 211, along with special allegations that Plaintiff had suffered several prior convictions for serious felonies within the meaning of California Penal Code §§ 667(d) and 1192.7(c), and two prior convictions that would yield a sentencing enhancement under California Penal Code § 667.5(b).  (SAC ¶ 21.)  The case proceeded to trial by jury, and Plaintiff was convicted of the robberies charged in Counts I, II, III, IV, V, VII, VIII, IX and X, and acquitted on Count VI.  (SAC ¶ 22.)  The state court found in a separate bench trial that Plaintiff had suffered the alleged prior convictions.  (Id.)

On May 16, 2017, the state court sentenced Plaintiff to an indeterminate sentence of 125 years to life in prison and a determinate sentence of 25 years imprisonment.  (SAC ¶ 23.)  Plaintiff was admitted to the California State Prison, Solano, on or around May 30, 2017.  (SAC ¶ 24.)  Plaintiff appealed his conviction, and on October 16, 2019, the Court of Appeal for the State of California, Fifth Appellate District, reversed the conviction.  (SAC ¶ 25.)  The case was remanded to the Stanislaus County Superior Court.  (Id.)  On October 24, 2019, Judge Nancy Ashley of the Stanislaus County Superior Court signed an order under case number 1480530 commanding the California Department of Corrections and Rehabilitation ("CDCR") to deliver Plaintiff into the custody of the Stanislaus County Sheriff, and ordering the Stanislaus County

---

[1]  All references to pagination of specific documents pertain to those as indicated on the upper right corners via the CM/ECF electronic court docketing system.

1  Sheriff to take custody of Plaintiff.  (SAC ¶ 26.)  On November 13, 2019, Rhona Delacruz,

2  acting in her capacity as an employee of CDCR, placed a detainer on Plaintiff.  (SAC ¶ 27.)  The

3  CDCR detainer was based on the May 16, 2017 commitment in case 1480530, which had already

4  been reversed by the Court of Appeal for the State of California, Fifth Appellate District.  (SAC

5  ¶ 28.)

6        On November 21, 2019, Plaintiff was transferred from the custody of CDCR to the

7  custody of the Stanislaus County Sheriff, and he was booked into Stanislaus County Jail.  (SAC

8  ¶ 29.)  On November 21, 2019, CDCR provided its detainer to the Stanislaus County Sheriff's

9  Department ("SCSD"), and an employee of SCSD signed for its receipt.  (SAC ¶ 30.)  On

10  December 13, 2019, Plaintiff appeared again before Judge Nancy Ashley of the Stanislaus

11  County Superior Court.  (SAC ¶ 31.)  At that time, Plaintiff accepted a plea agreement offered by

12  the Stanislaus County District Attorney's Office.  (Id.)  Pursuant to the terms of the plea

13  agreement, Plaintiff pled no contest to Counts I, II, III and IV of the information.  (Id.)  The

14  remaining counts and all enhancements were dismissed.  (Id.)  The Court sentenced Plaintiff to

15  six years imprisonment, calculating that he had earned custody credits totaling 2,518 days, and

16  thus, he already had substantially more than six years' worth of credits.  (SAC ¶ 32.)

17        When Plaintiff accepted the plea agreement on December 13, 2019, all parties involved –

18  the assistant district attorney, the judge, the defense attorney, and Plaintiff– had a shared

19  understanding that Plaintiff was to be processed and immediately released in connection with

20  case number 1480530.  (SAC ¶ 33.)  The minute order issued by the state court on December 13,

21  2019, reflects that shared understanding, and according to the minute order, Plaintiff's plea

22  resulted in a "paper commitment" – and thus he had already served his sentence and was entitled

23  to immediate release from custody.  (SAC ¶ 34.)  The minute order also stated that Plaintiff was

24  to be "released on parole" and directed him to report within seven days to the parole office.  (Id.)

25  On December 16, 2019, the state court filed the abstract of judgment, which confirmed that

26  Judge Ashley intended for Plaintiff to be processed and immediately released upon his December

27  13, 2019 resentencing.  (SAC ¶ 35.)  The abstract of judgment contained the Court's calculation

28  of Plaintiff's credits – 2518 total days, or substantially more than six years in total.  (Id.)  It also

1    explicitly ordered that Plaintiff was to be "remanded to the custody of the sheriff forthwith" and

2    "released on Parole ordered to report to Parole w/in 7 days." (Id.)  The abstract of judgment also

3    provided that the basis for Judge Ashley's order for the sheriff to release Plaintiff on parole

4    immediately was that "per PC 1170(a)(3)[,] [p]reconfinement credits equal or exceed time

5    imposed." (SAC ¶ 36.)

6        Despite the fact that the state court concluded Plaintiff had credits for time served that

7    exceeded the prison sentence imposed, and explicitly ordered the sheriff to release Plaintiff

8    immediately in case number 1480530, Plaintiff was not released. (SAC ¶ 37.)  On December 13,

9    2019, after his court appearance was concluded, Plaintiff was transported to Stanislaus County

10   Jail.  (SAC ¶ 38.)  That day, a copy of the state court's minute order was provided to SCSD.

11   (Id.)  When Plaintiff realized he was not being released, he informed Defendants in the

12   Stanislaus County Jail that the judge had ordered his release.  (SAC ¶ 39.)  Defendants did not

13   adequately inquire into or investigate Plaintiff's complaints, and he was not released.  (Id.)

14       On December 15, 2019, Henry Mendez, acting in his capacity as an employee of SCSD,

15   contacted Solano State Prison and spoke to Joseph Guerrero, who informed Henry Mendez that

16   Plaintiff should be returned to the custody of the CDCR based on the detainer in case 1480530.

17   (SAC ¶ 40.)  Henry Mendez informed Jose Sousa of the instructions given to him by Joseph

18   Guerrero.  (SAC ¶ 41.)  Henry Mendez and Jose Sousa chose to follow the advice of Joseph

19   Guerrero and return Plaintiff to CDCR's custody, rather than follow the court's order to release

20   Plaintiff.  (SAC ¶ 41.)

21       Plaintiff remained incarcerated in Stanislaus County Jail until December 18, 2019.  (SAC

22   ¶ 42.)  During the time he was incarcerated in Stanislaus County Jail, Plaintiff informed

23   Defendants on a daily basis that he had been ordered released, to no avail.  (SAC ¶ 43.)  On

24   December 18, 2019, Plaintiff was transported to the California State Prison, Solano.  (SAC ¶ 44.)

25   Shortly after arriving at California State Prison Solano, Plaintiff informed Defendants at Solano

26   that he had been ordered released and was being unlawfully detained, however, Defendants did

27   not adequately inquire into or investigate Plaintiff's complaints, and he was not released.  (SAC

28   ¶ 45.)

4

1      Plaintiff contacted his appellate attorney Rafael Goldman, to inform him of the situation,

2   and Mr. Goldman contacted Mary Ellen Hurtle, the attorney who represented Plaintiff at his

3   December 13, 2019 plea and resentencing in Stanislaus County Court.   (SAC ¶ 46.)   On

4   December 30, 2019, Mary Ellen Hurtle began making phone calls to CDCR to determine why

5   Plaintiff had not been released from custody as ordered by Judge Ashley over two weeks earlier.

6   (SAC ¶ 47.)   She made several phone calls to CDCR over the course of the day.   (Id.)   On

7   December 30, 2019, Defendants initially informed Ms. Hurtle that they would not release

8   Plaintiff because they did not have a minute order from the court, and the parole board would

9   "overrule" the court until CDCR received the court's minute order.   (SAC ¶ 48.)   Later that day,

10   Defendants told Ms. Hurtle they had requested the minute order from the court clerk and were

11   expecting it to be faxed to them.   (SAC ¶ 49.)   During the final phone call between Ms. Hurtle

12   and Defendants on December 30, 2019, Defendants informed Ms. Hurtle they had just received

13   the court's minute order that day.   (SAC ¶ 50.)   During that final phone call, Defendants verified

14   that the minute order authorized Plaintiff's release on December 13, 2019.   (SAC ¶ 51.)

15   However, they stated it would take an additional five to seven business days to process Plaintiff's

16   release, and estimated due to the New Year's holidays he would not be released until January 7,

17   2020.   (Id.)

18      Plaintiff highlights that had Defendants released Plaintiff when they were legally required

19   to do so, he would have celebrated Christmas with family members who had anticipated his

20   homecoming, including a grandmother in her mid-80s, but instead, he remained unlawfully

21   imprisoned.   (SAC ¶ 52.)   Plaintiff was finally released from California State Prison, Solano on

22   January 7, 2020.   (SAC ¶ 53.)   Therefore, Plaintiff was over-detained for a total of 25 days –

23   from December 13, 2019 until January 7, 2020.   (SAC ¶ 54.)   More than a week of his over-

24   detention took place after CDCR admitted they had received the court order stating he was

25   supposed to be free.   (Id.)

26      On June 23, 2020, Plaintiff submitted a tort claim to the CDCR and the Sheriff's Office.

27   (SAC 55.)   In a letter dated July 10, 2020, the CDCR, through the California Department of

28   General Services, rejected Plaintiff's tort claim on grounds including that it "involves complex

issues that are beyond the scope of analysis and legal interpretation typically undertaken" by the Government Claims Program Staff.  (SAC ¶ 56.)  In a letter dated August 6, 2020, the Sheriff's Office, through the Board of Supervisors of the County of Stanislaus returned the tort claim without taking action on it.  (SAC ¶ 57.)

The second amended complaint names the following defendants: (1) Jeff Dirkse, in his individual capacity, and official capacity as Sheriff of Stanislaus County; (2) Rhona Delacruz, an employee of CDCR who personally processed paperwork relating to Plaintiff's sentence and release; (3) Joseph Guerrero, an employee of CDCR who communicated with other Defendants and individuals regarding Plaintiff's sentence and release; (4) Tania Brown, an employee of CDCR who on or about December 30, 2019, personally processed paperwork related to Plaintiff's sentence and release; (5) Amber Steele-Hicks, an employee of CDCR who on or about December 31, 2019, personally processed paperwork related to Plaintiff's sentence and release; (6) Brandy Smith, an employee of CDCR in a supervisory capacity, who on December 30, 2019, had personal knowledge related to Plaintiff's sentence and release; (7) Elijah Pruitt, an employee of CDCR who was responsible for processing and following up on court records related to Plaintiff's case from October to December of 2019, and was personally aware that Plaintiff's court proceedings were concluded by December 17, 2019; (8) Nichelle Harrington, an employee of CDCR who personally processed paperwork related to Plaintiff's sentence and release, and noted Plaintiff's eligibility for "immediate release" on December 30, 2019; (9) Jose Sousa, an employee of SCSD who communicated with other Defendants and individuals regarding Plaintiff's sentence and release; and (10) Henry Mendez, an employee of SCSD who communicated with other Defendants and individuals regarding Plaintiff's sentence and release. (Compl. ¶¶ 10-19.)[2]  Plaintiff specifically alleges Defendant Jeff Dirkse was responsible for operating the Stanislaus County jail facilities, including promulgating policies and procedures at those facilities.  (Compl. ¶ 10.)  Aside from Defendant Dirkse, Plaintiff also specifically states

---

[2]  The parties refer to Jeff Dirske, Jose Sousa, and Henry Mendez as the "County Defendants," and Rhona Delacruz, Joseph Guerrero, Tania Brown, Amber Steele-Hicks, Brandy Smith, Elijah Pruitt, and Nichelle Harrington, as the "CDCR Defendants."  (ECF Nos. 34-1 at 6, 37 at 2.)  For purposes of this motion, the Court may use "County Defendants" or simply "Defendants" to refer to the moving Defendants, Jeff Dirske, Jose Sousa, and Henry Mendez.

that each Defendant's "actions and inaction resulted in Plaintiff's overdetention."  (Compl. ¶¶ 11-19.)

Plaintiff brings causes of action for: (1) violation of the Fourteenth Amendment to the U.S. Constitution against all Defendants; (2) violation of Article I, Section 7, of the California Constitution against all Defendants; (3) negligence against all Defendants; (4) false imprisonment against all Defendants; (5) Monell and failure to train and supervise against Defendant Dirkse; and (6) vicarious liability against Defendant Dirkse.  (SAC ¶¶ 58-89.)

Plaintiff seeks declaratory relief; compensatory damages to include general and special damages; exemplary and/or punitive damages from all Defendants except Dirkse; attorneys' fees and expenses under 42 U.S.C. § 1988(b); and such other relief, including injunctive relief, that is just and proper.  (SAC ¶ 91.)

## B.    Procedural Background

Plaintiff initially filed this action on June 22, 2020.  (ECF No. 1.)  On August 21, 2020, Defendant Jeff Dirkse filed a motion to dismiss.  (ECF No. 10.)  On September 4, 2020, Plaintiff filed a motion to amend.  (ECF No. 15.)  On September 11, 2020, the Court granted Plaintiff's unopposed motion to amend.  (ECF No. 20.)  On September 15, 2020, Plaintiff filed a first amended complaint.  (ECF No. 21.)  On September 29, 2020, a motion to dismiss was filed which was referred to the undersigned for the preparation of findings and recommendations. (ECF Nos. 27, 28.)  On October 12, 2020, the parties filed a stipulation for a second amended complaint to be filed and for the pending motion to dismiss to be applied to the second amended complaint, and the hearing on the motion to dismiss to be continued to December 9, 2020.  (ECF No. 29.)  On October 13, 2020, the Court granted the stipulation in part allowing for the filing of a second amended complaint, however, the Court denied the parties' request to apply the filed motion to dismiss to the to-be-filed second amended complaint.  (ECF No. 30.)  The Court's order specified that the motion to dismiss should be corrected to align with the allegations in the second amended complaint and be refiled.  (Id.)  On October 14, 2020, Plaintiff filed a second amended complaint, rendering the motion to dismiss moot, and the Court denied the motion to dismiss as moot.  (ECF Nos. 31, 32.)

1    On October 23, 2020, Defendants Jeff Dirkse, Jose Sousa, and Henry Mendez filed the

2    motion to dismiss that is currently before the undersigned following referral by the District

3    Judge.  (ECF Nos. 34, 36.)  On November 25, 2020, Plaintiff filed an opposition to the motion to

4    dismiss.  (ECF No. 37.)  On December 2, 2020, Defendants filed a reply brief.  (ECF No. 38.)

5    On December 9, 2020, the Court held a hearing on the motion via videoconference.  (ECF No.

6    39.)   William Most and Daniel Roth appeared on behalf of Plaintiff David McDaniel, and

7    Shanan L. Hewitt appeared on behalf of Defendants Jeff Dirkse, Henry Mendez, and Jose Sousa.

8    On December 14, 2020, Defendants Tania Brown, Rhonda Delacruz, Joseph

9    Guerrero, Nichelle Harrington, Elijah Pruitt, and Brandy Smith, filed a separate motion to

10   dismiss.  (ECF No. 40.)

11                                              **III.**

12                                      **LEGAL STANDARD**

13   Under Federal Rule of Civil Procedure 12(b)(6), a party may file a motion to dismiss on

14   the grounds that a complaint "fail[s] to state a claim upon which relief can be granted."  A

15   motion to dismiss pursuant to Rule 12(b)(6) tests the legal sufficiency of the complaint.  Navarro

16   v. Block, 250 F.3d 729, 732 (9th Cir. 2001).  In deciding a motion to dismiss, "[a]ll allegations

17   of material fact are taken as true and construed in the light most favorable to the nonmoving

18   party."  Cahill v. Liberty Mut. Ins. Co., 80 F.3d 336, 337–38 (9th Cir. 1996).  The pleading

19   standard under Rule 8 of the Federal Rules of Civil Procedure does not require " 'detailed factual

20   allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me

21   accusation."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v.

22   Twombly, 550 U.S. 544, 555 (2007)).  In assessing the sufficiency of a complaint, all well-

23   pleaded factual allegations must be accepted as true.  Iqbal, 556 U.S. at 678-79.  However,

24   "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory

25   statements, do not suffice."  Id. at 678.  To avoid a dismissal under Rule 12(b)(6), a complaint

26   must plead "enough facts to state a claim to relief that is plausible on its face."  Twombly, 550

27   U.S. at 570.

28   In deciding whether a complaint states a claim, the Ninth Circuit has found that two

1   principles apply.  First, to be entitled to the presumption of truth the allegations in the complaint
2   "may not simply recite the elements of a cause of action, but must contain sufficient allegations
3   of underlying facts to give fair notice and to enable the opposing party to defend itself
4   effectively."  Starr v. Baca, 652 F.3d 1202, 1216 (9th Cir. 2011).  Second, so that it is not unfair
5   to require the defendant to be subjected to the expenses associated with discovery and continued
6   litigation, the factual allegations of the complaint, which are taken as true, must plausibly
7   suggest an entitlement to relief.  Starr, 652 F.3d at 1216.  "Dismissal is proper only where there
8   is no cognizable legal theory or an absence of sufficient facts alleged to support a cognizable
9   legal theory."  Navarro, 250 F.3d at 732 (citing Balistreri v. Pacifica Police Dept., 901 F.2d 696,
10  699 (9th Cir.1988)).

11                                              **IV.**

12                               **ANALYSIS AND DISCUSSION**

13          Defendants move to dismiss this action on the following grounds: (A) Plaintiff's first
14  cause of action fails as the complaint does not state a Fourteenth Amendment claim against the
15  County Defendants; (B) Plaintiff's fifth cause of action fails to state a 42 U.S.C. § 1983 Monell
16  claim against Defendant Dirkse; (C) Defendants Dirkse, Sousa, and Mendez are entitled to
17  qualified immunity; (D) Plaintiff failed to comply with the California Government Claims Act;
18  (E) Plaintiff's second cause of action fails to allege facts sufficient to state a claim as no damages
19  are available under Article 1, Section 7 of the California Constitution; (F) Plaintiff's third and
20  fourth causes of action for negligence and false imprisonment fail to allege facts sufficient to
21  state a claim against the County Defendants; (G) Plaintiff's sixth cause of action fails as
22  California Government Code Section 820.8 immunizes Defendant Dirkse from vicarious
23  liability; and (H) Plaintiff fails to allege facts sufficient to state a claim for punitive damages
24  against Defendants Dirkse, Sousa, or Mendez.  (Defs. Dirkse, Sousa & Mendez's Mem. P. & A.
25  Supp. Mot. Dismiss SAC ("Mot"), ECF No. 34-1.)

26  / / /

27  / / /

28  / / /

9

### A. Whether Plaintiff's First Cause of Action States a Fourteenth Amendment Claim Against the County Defendants

The County Defendants move to dismiss Plaintiff's first cause of action for failure to state a claim under the Fourteenth Amendment. (Mot. 9.)

Plaintiff's first cause of action is raised against all Defendants. In addition to incorporating the common factual allegations in the general factual portion of the complaint, Plaintiff alleges Defendants violated his Fourteenth Amendment rights by "detaining him for 25 days after the legal authority to hold him expired," and by failing "to investigate his claims that he was lawfully entitled to release." (SAC ¶¶ 58-61.) Specifically, Plaintiff was a CDCR prisoner that was transferred to the Stanislaus County Jail for court proceedings pursuant to a court order from Stanislaus County Superior Court Judge Nancy Ashley. (SAC ¶ 26.) CDCR placed a detainer on Plaintiff prior to his transfer to Stanislaus County for court proceedings and provided the detainer to the Stanislaus County Sheriff's Department. (SAC ¶¶ 27, 28, 30.) On Friday, December 13, 2019, Plaintiff attended a Stanislaus County Superior Court hearing where he was resentenced to time served and ordered released on case number 1480530. (SAC ¶¶ 32, 33.) On December 13, 2019, after the court appearance was concluded, Plaintiff was transported back to Stanislaus County Jail. (SAC ¶¶ 38.) When Plaintiff realized he was not being released, "he informed Defendants in the Stanislaus County Jail that the judge had ordered his release," Defendants did not adequately inquire into or investigate Plaintiff's complaints, and he was not released. (SAC ¶ 39.) On December 15, 2019, Stanislaus County Sheriff's Department employee Henry Mendez contacted CDCR and spoke with CDCR Defendant Joseph Guerrero who advised Mendez that Plaintiff should be returned to CDCR custody, and Plaintiff was returned to California State Prison, Solano on December 18, 2019. (SAC ¶¶ 40, 41, 42, 44.)

Defendants argue these facts are insufficient to state a claim for a Fourteenth Amendment violation against any of the County Defendants.

/ / /

/ / /

/ / /

1.     <u>Plaintiff's First Cause of Action Fails to State a Claim Against Defendant Sheriff Dirkse</u>

Defendants argue Plaintiff makes no factual allegations whatsoever to support a Fourteenth Amendment claim against Sheriff Dirkse, and Section 1983 liability cannot be imposed on him in an individual capacity without a showing of personal participation.  (Mot. 9.)  Defendant Jeff Dirkse, Sheriff of Stanislaus County, is responsible for operating the Stanislaus County jail facilities, including promulgating policies and procedures at such facilities, and is specifically sued in his individual and official capacities.  (SAC ¶ 10.)  The Court notes that the first cause of action for violation of the Fourteenth Amendment is directed generally at all Defendants, the fifth cause of action under <u>Monell</u> and for failure to train and supervise is directed against Defendant Dirkse only without specifying an official or individual capacity, and the sixth cause of action for vicarious liability is directed against Defendant Dirkse only and specifies that Defendant Dirkse is liable in "his official capacity as Sheriff of Stanislaus County."  (SAC ¶¶ 58-61, 82-86, 87-89.)

County Defendants argue the first cause of action contains only boilerplate, conclusory allegations against Defendant Dirkse which are insufficient under <u>Iqbal</u> pleading standards and its discussion of supervisory liability in the context of a Section 1983 claim.

The Court agrees.  Section 1983 provides a cause of action for the violation of Plaintiff's constitutional or other federal rights by persons acting under color of state law.   <u>Nurre v. Whitehead</u>, 580 F.3d 1087, 1092 (9th Cir 2009); <u>Long v. County of Los Angeles</u>, 442 F.3d 1178, 1185 (9th Cir. 2006); <u>Jones v. Williams</u>, 297 F.3d 930, 934 (9th Cir. 2002).   The statute provides:

> Every person who, under color of [state law] . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution . . . shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983.  "Section 1983 is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred."  <u>Crowley v. Nevada ex rel. Nevada Sec'y of State</u>, 678 F.3d 730, 734 (9th Cir. 2012) (citing <u>Graham v. Connor</u>, 490 U.S. 386, 393-

94 (1989)) (internal quotation marks omitted).

The statute requires that there be an actual connection or link between the actions of the defendants and the deprivation alleged to have been suffered by Plaintiff.  See Monell v. Dep't of Soc. Servs., 436 U.S. 658 (1978); Rizzo v. Goode, 423 U.S. 362 (1976).  To state a claim under section 1983, Plaintiff must demonstrate that each defendant personally participated in the deprivation of his rights.  Iqbal, 556 U.S. at 677; Simmons v. Navajo County, Ariz., 609 F.3d 1011, 1020-21 (9th Cir. 2010); Ewing v. City of Stockton, 588 F.3d 1218, 1235 (9th Cir. 2009); Jones, 297 F.3d at 934.  Thus, to state a claim, Plaintiff must allege facts demonstrating the existence of a link, or causal connection, between each Defendant's actions or omissions and a violation of his federal rights.  Lemire v. California Dep't of Corr. and Rehab., 726 F.3d 1062, 1074-75 (9th Cir. 2013); Starr v. Baca, 652 F.3d 1202, 1205-08 (9th Cir. 2011).  The Ninth Circuit has held that "[a] person 'subjects' another to the deprivation of a constitutional right, within the meaning of section 1983, if he does an affirmative act, participates in another's affirmative acts or omits to perform an act which he is legally required to do that causes the deprivation of which complaint is made."  Johnson v. Duffy, 588 F.2d 740, 743 (9th Cir. 1978).

"Under Section 1983, supervisory officials are not liable for actions of subordinates on any theory of vicarious liability."  Crowley v. Bannister, 734 F.3d 967, 977 (9th Cir. 2013) (citation and internal quotation marks omitted); see also Iqbal, 556 U.S. at 676; Simmons v. Navajo Cnty., Ariz., 609 F.3d 1011, 1020–21 (9th Cir.2010); Ewing v. City of Stockton, 588 F.3d 1218, 1235 (9th Cir. 2009); Jones v. Williams, 297 F.3d 930, 934 (9th Cir. 2002).  "A supervisor may be liable only if (1) he or she is personally involved in the constitutional deprivation, or (2) there is 'a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation.' "  Crowley, 734 F.3d at 977 (citation and internal quotation marks omitted).  "Under the latter theory, supervisory liability exists even without overt personal participation in the offensive act if supervisory officials implement a policy so deficient that the policy itself is a repudiation of constitutional rights and is the moving force of a constitutional violation."  Id.; see also Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989) ("A supervisor is only liable for constitutional violations of his subordinates if the supervisor

1 participated in or directed the violations, or knew of the violations and failed to act to prevent
2 them."); accord Starr v. Baca, 652 F.3d 1202, 1205–06 (9th Cir. 2011); Corales v. Bennett, 567
3 F.3d 554, 570 (9th Cir. 2009).

4       To the extent that Plaintiff seeks to hold Defendant Dirkse liable in an individual capacity
5 for the first cause of action, Plaintiff has not sufficiently alleged any facts to do so. Plaintiff has
6 failed to allege Defendant Dirkse made or ratified any decisions concerning Plaintiff's temporary
7 out-to-court detention at the Stanislaus County Jail, and there are no allegations that Dirkse
8 personally had any dealings with Plaintiff, was present, or had any involvement in Plaintiff's
9 temporary jail detention or transfer back to CDCR custody.

10       Plaintiff's opposition brief did not directly address Defendants' motion to dismiss the
11 first cause of action as to Defendant Dirkse specifically. Plaintiff instead appears to only address
12 Defendant Dirkse as it pertains to Defendants' challenge to Plaintiff's Monell claim. (Pl.'s
13 Opp'n Defs.' Mot. Dismiss (Opp'n), ECF No. 37.) The complaint fails to mention Dirkse nor
14 mentions any policy, training, or supervision, until the fifth cause of action. (SAC ¶¶ 1-86.) The
15 Court addresses the motion to dismiss the fifth cause of action against Sheriff Dirkse below.

16       Accordingly, the Court recommends that Plaintiff's first cause of action against Sheriff
17 Dirkse be dismissed.

18       2.    Defendants Henry Mendez and Jose Sousa

19       Defendants state that it "appears Plaintiff is alleging a Fourteenth Amendment
20 substantive due process claim," and argue they have committed no due process violations in this
21 case. (Mot. 10-11.) They proffer that while no case directly on point has been identified, they
22 provide the Court with cases alleging wrongful detention under the Fourteenth Amendment, with
23 "somewhat similar facts." (Mot. 11.)

24       Defendants first direct the Court to West v. Tillman, in which jail inmates brought suit
25 against a sheriff and jail employees alleging Fourteenth Amendment due process violations when
26 the jail failed to properly process court orders authorizing their release from custody. 496 F.3d
27 1321, 1327 (11th Cir. 2007) (per curiam). In upholding the district court's granting of
28 defendants' motion for summary judgment based on qualified immunity, the Eleventh Circuit

1  explained that the Fourteenth Amendment analysis for over-detention of inmates requires a

2  plaintiff to demonstrate that the defendant acted with deliberate indifference to his or her due

3  process rights, as human error does not equal deliberate indifference.  Id.  The Eleventh Circuit

4  ultimately ruled that, at most, the defendants had been negligent in failing to carry out their

5  duties and found no Fourteenth Amendment violation.   Id. ("Defendant Whitton had been

6  employed at the Jail for only a few weeks . . . entered some of the relevant information into the

7  computer system but failed to deliver the jail card to the docketing room [and plaintiff] pointed

8  to no evidence showing that Whitton subjectively knew that her acts would lead to West's over-

9  detention or that she disregarded any such risk . . . although Defendant Davis was an experienced

10  records specialist and testified that she understood the risks associated with her duties, nothing

11  evidences that her failure to ensure that West's jail card reached the docket room resulted from

12  anything more than negligence [and] Davis testified that the West release papers simply "fell

13  between the gaps" because of the volume of work in the records room, and testimony from other

14  Jail staff supports her assertion.").

15       The County Defendants next highlight Baker v. McCollan, wherein the Supreme Court

16  summarized the allegations as follows: "Absent an attack on the validity of the warrant under

17  which he was arrested, respondent's complaint is simply that despite his protests of mistaken

18  identity, he was detained in the Potter County jail from December 30, when Potter County

19  deputies retrieved him from Dallas, until January 2, when the validity of his protests was

20  ascertained . . . [claimant] was indeed deprived of his liberty for a period of days, but it was

21  pursuant to a warrant conforming, for purposes of our decision, to the requirements of the Fourth

22  Amendment."  Baker v. McCollan, 443 U.S. 137, 143-144 (1979).[3]  The Supreme Court held in

23  ---

[3]  The specific facts surrounding the mistaken identity involved in Baker as are follows:

Leonard McCollan and respondent Linnie Carl McCollan are brothers. Leonard somehow procured a duplicate of Linnie's driver's license, identical to the original in every respect except that, as the Court of Appeals put it, "Leonard's picture graced it instead of Linnie's." McCollan v. Tate, 575 F.2d 509, 511 (CA5 1978). In October 1972, Leonard, masquerading as Linnie, was arrested in Potter County on narcotics charges. He was booked as Linnie Carl McCollan, signed various documents as Linnie Carl McCollan, and was released on bail as Linnie Carl McCollan. Leonard's bondsman sought and received an order allowing him to surrender his principal and a warrant was issued for the arrest of "Linnie Carl McCollan."

relevant part:

> Respondent's innocence of the charge contained in the warrant, while relevant to a tort claim of false imprisonment in most if not all jurisdictions, is largely irrelevant to his claim of deprivation of liberty without due process of law. The Constitution does not guarantee that only the guilty will be arrested. If it did, § 1983 would provide a cause of action for every defendant acquitted—indeed, for every suspect released . . .

> . . . The Fourteenth Amendment does not protect against all deprivations of liberty. It protects only against deprivations of liberty accomplished "without due process of law." A reasonable division of functions between law enforcement officers, committing magistrates, and judicial officers—all of whom may be potential defendants in a § 1983 action—is entirely consistent with "due process of law." Given the requirements that arrest be made only on probable cause and that one detained be accorded a speedy trial, we do not think a sheriff executing an arrest warrant is required by the Constitution to investigate independently every claim of innocence, whether the claim is based on mistaken identity or a defense such as lack of requisite intent. Nor is the official charged with maintaining custody of the accused named in the warrant required by the Constitution to perform an error-free investigation of such a claim. The ultimate determination of such claims of innocence is placed in the hands of the judge and the jury . . .

> . . . Section 1983 imposes liability for violations of rights protected by the Constitution, not for violations of duties of care arising out of tort law. Remedy for the latter type of injury must be sought in state court under traditional tort-law principles. Just as "[m]edical malpractice does not become a constitutional violation merely because the victim is a prisoner," *Estelle v. Gamble*, 429 U.S. 97, 106, 97 S.Ct. 285, 292, 50 L.Ed.2d 251 (1976), false imprisonment does not become a violation of the Fourteenth Amendment merely because the defendant is a state official.

Baker, 443 U.S. at, 145-146. Thus, important to the holding in Baker was the fact that the sheriff executed a warrant that was presumably valid, and there was no duty at that juncture to investigate the claim of mistaken identity as that role is reserved for the judge and jury. Id.

Defendants note that the "facts in the instant case are somewhat different from these

---

On December 26, 1972, Linnie was stopped in Dallas for running a red light. A routine warrant check revealed that Linnie Carl McCollan was wanted in Potter County, and respondent was taken into custody over his protests of mistaken identification. The Dallas Police Department contacted the Potter County Sheriff's Department, compared the identifying information on respondent's driver's license with that contained in the Potter County arrest records, and understandably concluded that they had their man. On December 30, Potter County deputies took custody of respondent and placed him in the Potter County Jail in Amarillo. He remained there until January 2, 1973, when officials compared his appearance against a file photograph of the wanted man and, recognizing their error, released him.

443 U.S. at 140–41.

cases since Plaintiff McDaniel was in fact a CDCR prisoner being temporarily held at the Stanislaus County Jail ("out to court") solely for criminal case proceedings."  (Mot. 11.) Defendants proffer that under such circumstances, the California Penal Code makes clear that a CDCR prisoner remains a CDCR prisoner even when ordered out to court and temporarily held at the county jail.  (Id.)  California Penal Code section 2690.5 states, in pertinent part:

> (a) The superior court of the county in which a requesting district attorney or peace officer has jurisdiction may order the temporary removal of a prisoner from a state prison facility, and his or her transportation to a county or city jail, if a legitimate law enforcement purpose exists to move the prisoner. An order for the temporary removal of a prisoner may be issued, at the discretion of the court, upon a finding of good cause in an affidavit by the requesting district attorney or peace officer stating that the law enforcement purpose is legitimate and necessary.
> ***
> (e) If a prisoner is removed from a state prison facility pursuant to an order in accordance with this section, the prisoner shall remain at all times in the constructive custody of the warden of the state prison facility from which the prisoner was removed.

Cal. Penal Code § 2690.5.

Given the above, Defendants again highlight the following aspects of Plaintiff's complaint: Plaintiff was a CDCR prisoner and CDCR placed a detainer on him which it provided to the Stanislaus County Sheriff's Department when he was transferred to the Stanislaus County Jail for court proceedings (SAC ¶¶ 26-30); after the Stanislaus County Superior Court hearing on December 13, 2019, Stanislaus County Sheriff's Department employee Henry Mendez contacted CDCR on December 15, 2019, and CDCR Official Joseph Guerrero advised Mendez that Plaintiff should be returned to CDCR custody (SAC ¶¶ 40, 41); Henry Mendez informed Stanislaus County Sgt. Jose Sousa of CDCR's instructions to return Plaintiff to CDCR custody, and Mendez and Sousa followed CDCR's instructions and returned Plaintiff to CDCR custody on December 18, 2019 (SAC ¶¶ 41, 42, 44).  (Mot. 12.)

Based on these facts, Defendants argue there are fundamental problems with Plaintiff's allegations against the County Defendants.  First, to the extent that Plaintiff alleges Defendants Mendez and Sousa should have released Plaintiff from the jail without returning him to CDCR custody after his court hearing in Stanislaus County, the SAC fails to allege that Mendez or Sousa subjectively knew that their acts would lead to wrongful detention or that they disregarded

1   any such risk.  (Mot. 12.)  Given Plaintiff was a CDCR prisoner and was to be processed for

2   release on parole (SAC ¶¶ 32-35), the County Defendants argue their actions in following

3   CDCR's directive to return the Plaintiff, a CDCR prisoner, to CDCR custody after the superior

4   court resentenced Plaintiff and ordered him to be released on parole does not constitute a

5   constitutional violation by County Defendants.  (Mot. 12.)  Defendants highlight the state court's

6   October 24, 2019 order specifically commanded the Sheriff to return Plaintiff back to CDCR

7   custody at the conclusion of the court proceedings, and the County Defendants followed that

8   order.  (Mot. 12, Defs.' Exh. B and Request for Judicial Notice, ECF No. 34-2 at 18-20.)[4]

9        Defendants further argue the fact state court ordered Plaintiff sentenced to time

10  served and released on parole for one criminal case does not address the possibility that Plaintiff

11  was serving prison time in CDCR for other convictions outside the jurisdiction of Stanislaus

12  County, and if Plaintiff was serving a sentence in another case, Plaintiff would necessarily be

13  returned to CDCR custody to continue serving the other sentence.  (Mot. 13.)  Defendants

14  contend the complaint is silent on this issue as there are no allegations to indicate the County

15  Defendants knew or should have known that case number 1480530 was the only prison sentence

16  Plaintiff was serving in CDCR, and thus Defendants submit that when there are two possible

17  ───────────────

18  [4]  Defendants request the Court take judicial notice of the following: (1) a Declaration and Order for Production from California State Prison, filed October 24, 2019, Case No. 1480530; and (2) Stanislaus County's August 6, 2020

19  response to Plaintiff David McDaniel's government tort claim.  (ECF Nos. 34-2, 34-3.)  Because the Court may take judicial notice of public records, including duly recorded documents under Rule 201(b)(2), Defendants' request to

20  take judicial notice of the Declaration and Order for Production from California State Prison, filed October 24, 2019, Case No. 1480530, is granted.  Federal Rule of Evidence 201 permits the Court to take judicial notice at any time.

21  A judicially noticed fact must be one not subject to reasonable dispute in that it is either: (1) generally known within the territorial jurisdiction of the trial court; or (2) capable of accurate and ready determination by resort to sources

22  who accuracy reasonably cannot be questioned.  Fed. R. Evid. 201(b).  Courts may take judicial notice of facts related to the case before it.  Amphibious Partners, LLC v. Redman, 534 F.3d 1357, 1361-1362 (10th Cir. 2008)

23  (district court was entitled to take judicial notice of its memorandum of order and judgment from previous case involving same parties).  This Court may judicially notice the records and filing of other court proceedings.  Tellabs,

24  Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007); Bennett v. Medtronic, Inc., 285 F.3d 801, 802 n.2 (9th Cir. 2002).  Records of CDCR are subject to judicial notice as records not subject to reasonable dispute, as are

25  records of California state courts.  Fed. R. Evid. 201(b)(2); City of Sausalito v. O'Neill, 386 F.3d 1186, 1223 n. 2.(9th Cir. 2004); Harris v. Cnty. of Orange, 682 F.3d 1126, 1132 (9th Cir. 2012).

26  As for the second document, Stanislaus County's August 6, 2020 response to Plaintiff David McDaniel's government tort claim, Defendants have not provided authority as to whether the Court may readily take judicial

27  notice of such document.   Nonetheless, judicial notice of this document is unnecessary to the Court's recommendations herein, as Plaintiff's complaint alleges that the County of Stanislaus returned the tort claim on

28  August 6, 2020.  (SAC ¶ 57.)

1  explanations for events, only one of which can be true and only one of which results in liability,

2  a plaintiff must offer more than allegations that are "merely consistent with" their favored

3  explanation but also consistent with the alternative explanation, In re Century Aluminum Co.

4  Securities Litigation, 729 F.3d 1104, 1108 (9th Cir. 2013). (Mot. 13.) Defendants thus argue

5  Plaintiff's bare allegation that Defendants failed "to investigate [plaintiff's] claims that he was

6  lawfully entitled to release" (SAC at ¶ 61), is nothing more than a vague, conclusory allegation

7  of official participation in an alleged civil rights violation. Ivey v. Bd. of Regents of Univ. of

8  Alaska, 673 F.2d 266, 268 (9th Cir. 1982) ("However, a liberal interpretation of a civil rights

9  complaint may not supply essential elements of the claim that were not initially pled. Vague and

10  conclusory allegations of official participation in civil rights violations are not sufficient to

11  withstand a motion to dismiss.").

12      Plaintiff responds that Defendants Mendez and Sousa's decision to imprison Plaintiff for

13  five days after a judge ordered him immediately released, states a claim for a clearly established

14  violation of the Fourteenth Amendment, as a prisoner has a "due process right to be released

15  within a reasonable time after the reason for his detention ended," Brass v. Cty. of Los Angeles,

16  328 F.3d 1192, 1200 (9th Cir. 2003).[5] (Opp'n 3.) Plaintiff concedes that such principle does not

17

---

18  [5] In Brass, while the Ninth Circuit affirmed there is a  due process right to be released within a reasonable time after

19  the reason for incarceration has ended, the Ninth Circuit held a certain procedural order of processing releases, to the extent it caused a 39-hour delay in release, did not violate that right under such circumstances:

20      Brass may have had a due process right to be released within a reasonable time after

21      his detention ended. See Baker v. McCollan, 443 U.S. 137, 144–46, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979); Oviatt v. Pearce, 954 F.2d 1470, 1474 (9th Cir.1992) (citation omitted) ("[A]n individual

22      has a liberty interest in being free from incarceration absent a criminal conviction."). The question here, however, is whether the County denied him that right because its policy or custom of processing court-ordered releases only after it has processed all other releases increased by an

23      indeterminate amount the delay between the court order and his actual release.

24      Brass did not have a constitutional right to have his release papers processed in any particular

25      order or ahead of other prisoners whose papers the Sheriff's Department received the same day as his. The order in which the Sheriff's Department handles prisoner releases is an administrative matter primarily within the Department's discretion. We know of no requirement, constitutional or

26      otherwise, that the Department process release papers in the precise order in which it receives them, or process court-ordered releases ahead of all others. In these circumstances, we cannot say

27      that to the extent that the 39–hour delay in releasing Brass resulted from that policy or custom, it violated his constitutional right to due process of law.

28  Brass, 328 F.3d at 1200.

mean a jailor is "instantly liable" or must release an inmate immediately, but proffers courts do interpret a "reasonable time" as being a short period, usually found to be between thirty minutes to a few hours, and in some circumstances, a day or two.  (Opp'n 3.)  Plaintiff cites <u>Lewis v. O'Grady</u>, wherein the Seventh Circuit remanded the case and held whether an 11-hour delay was acceptable was a question to be presented to a jury:

> Here, the defendant explained that Lewis was detained because the first CCDOC bus returning to the jail left before his identity was verified and he had to wait five hours for the next available bus. Additionally, the sheriff claims that it "takes some time to sort out" the approximate 600–800 prisoners who are returned from court each day because the CCDOC [jail] covers fifty-two acres and consists of several buildings.

> We recognize that the administrative tasks incident to a release of a prisoner from custody may require some time to accomplish—in this case perhaps a number of hours. Reasonable time must be allowed for such matters as transportation, identity verification, and processing. It is virtually impossible to establish an absolute minimum time to meet all potential circumstances which might exist. What is a reasonable time for detaining a prisoner in custody is a question best left open for juries to answer based on the facts presented in each case. In the instant case, a reasonable jury could find that the "administrative" delay in Lewis' release was unreasonable. Consequently, the district court's order granting a directed verdict was improper.

> It is for a jury to determine whether the 11 hours it took the sheriff to discharge Lewis was reasonable. Since the jury did not have an opportunity to consider this issue, the case must be remanded.

<u>Lewis v. O'Grady</u>, 853 F.2d 1366, 1370 (7th Cir. 1988).

Plaintiff cites another Seventh Circuit case wherein the court of appeals found the district court erred in denying class certification to a class of inmates claiming improper delay in processing release:

> The district court erred in applying the 48-hour presumption to this context and in relying on it as a basis to deny class certification. The court relied for that denial on the Supreme Court's holding in *McLaughlin*, which addressed the detention resulting from a warrantless arrest and held that the amount of time between the warrantless arrest and a judicial determination of probable cause was presumptively reasonable if it was 48 hours or less, and presumptively unreasonable if longer. See *McLaughlin*, 500 U.S. at 56–57, 111 S.Ct. 1661; *Portis v. City of Chicago, Illinois*, 613 F.3d 702, 703–04 (7th Cir. 2010). That time period necessarily would include the time involved in processing and booking the defendant, determining the appropriate charge and preparing charging documents, assigning and transporting to court, and ultimately obtaining a judicial determination of probable cause. See *McLaughlin*, 500 U.S. at 55, 111 S.Ct. 1661.

> The class proposed by the plaintiffs involved a markedly different situation. It is composed of persons for whom legal authority for detention has ceased, whether

> by acquittal after trial, release on recognizance bond, completion of jail time in the sentence, or otherwise. For those persons, all that is left is for the officials to merely process the release. None of the myriad steps required in *McLaughlin*, between an arrest and a judicial determination of probable cause, are required here; the class members already qualify for release, and all that is left are the ministerial actions to accomplish that release which are within the control of the jail officials. Evidence in the record indicates that the average time period to effect such a release is 2–4 hours in counties in general, and up to 6 hours if problems are encountered, but even if we doubled those times, release still would be accomplished within 12 hours. Because the tasks involved in the situation presented here are significantly less onerous and less time-consuming than the ones involved in *McLaughlin*, the 48-hour rule makes no sense in this context.
>
> Accordingly, the district court erred in denying the subclass based on its perception that the 48-hour rule in *McLaughlin* would create different burdens and challenges among the potential subclass members. The only other reason given by the court for denying the subclass was that individual variables could complicate the timing of the release, but those variables were present in *McLaughlin* as well and they did not preclude class status. The Court in *McLaughlin* recognized that at some point the State has no legitimate interest in detaining persons for an extended period of time, and if the regular practice exceeds that time period deemed constitutionally-permissible, the State is not immune from systemic challenges such as a class action. 500 U.S. at 55, 58–59, 111 S.Ct. 1661. At some point well short of the 24-plus hours alleged here, there is no reason to believe that individual issues would account for that delay.

Driver v. Marion Cty. Sheriff, 859 F.3d 489, 491–92 (7th Cir. 2017).  Thus, the Seventh Circuit found the difference between the issue of impermissible delay in the time between a warrantless arrest and a judicial determination of probable cause in McLaughlin, and alleged impermissible delay where the legal authority for detention had been extinguished.  Driver, 859 F.3d at 491–92 (citing Cty. of Riverside v. McLaughlin, 500 U.S. 44, 57 (1991)).

Plaintiff also directs the Court to the Eighth Circuit.  While upholding the district court's decision finding qualified immunity applied to officers that thought it was reasonable to wait for a judge's decision to release a person subject to a warrant that the officers in fact believed was meant for a different person than the one detained, the Eight Circuit found it was appropriate for the jury to consider the question of whether the city was liable for actions taken after the plaintiff was ordered released by the municipal court:

> We now turn to the portion of the case that went to the jury—the action against the City of Little Rock for events that took place after Ms. Young was ordered released by the Municipal Court. The City argues that some period of time must be allowed for an order of release to be carried out, and that certain administrative formalities (referred to as "out-processing") are permissible. Certainly the jury might have accepted this argument, but we do not think it had to. When Ms. Young appeared in court on Monday morning, the judge ordered a thumbprint

20

comparison, a more reliable means of identification than a photograph. On the basis of this comparison, the court found that Ms. Young had not been properly arrested. The court stated: "show this lady released." Instead of releasing her, however, officers returned her to the holding cell, along with other prisoners, for transportation back to the jail. She was chained to five or six other female inmates, loaded onto a van, transported to the jail, and there strip searched, all of this occurring after the court had ordered her released. The strip search took place in front of five or six other people. Only after this was she allowed to change into her own clothes and actually set free.

The City contends that the phrase "show her released" is not the same thing as ordering her released in the courtroom. The matter, we suppose, is arguable, but it is not so clear as to make the jury's verdict unreasonable as a matter of law. Indeed, the City itself, in its answer to paragraph 41 of the complaint, stated that "Judge Munson ... dismissed the charge as to Mrs. Young and ordered her released ...." The City says it was not practical to release her at that time, because she was still in jail clothing (an orange jumpsuit). We think the jury could reasonably conclude that this aspect of the problem could have been left up to the plaintiff. In addition, the City could have had her transported back to the jail without chaining her, and certainly there was no necessity whatever to strip search a person who was wholly innocent of any charge. The whole incident is shocking.

Young v. City of Little Rock, 249 F.3d 730, 735–36 (8th Cir. 2001).

Plaintiff cites Green v. Baca, wherein the district court first found triable issues regarding the reasonableness of the delay before release, specifically as to the claim pertaining to customs and policies pertinent to the plaintiff's Monell claim.  While the discussion is more directly pertinent to Plaintiff's fifth cause of action under Monell, the Court introduces the court's discussion at length here as it particularly relevant to the Ninth Circuit's holding in Brass, 328 F.3d 1192, cited above, as well as Plaintiff's allegations that he repeatedly informed Defendants that he was entitled to be released:

As noted earlier, plaintiff's lawsuit challenges defendant's customs and policies regarding the release of persons held in the county jail. Defendant has not provided discovery to plaintiff as yet concerning those policies and practices; indeed, it argued that it should not be required to do so until this motion was heard and decided.  This position is based on defendant's view that whether plaintiff has suffered a constitutional violation, and whether that violation was caused by an unconstitutional policy, are separate and distinct issues. The court is not convinced that the *Monell* inquiry is so simple. In fact, the primary case on which defendant relies—*Brass v. County of Los Angeles,* 328 F.3d 1192 (9th Cir.2003)—belies defendant's argument . . . The Ninth Circuit did not, as defendant maintains, find that the delay in plaintiff's release of 39 hours was reasonable as a matter of law . . . Rather, it rejected such a rigid approach, and held that defendant's *policy* of processing court-ordered releases last was not unconstitutional . . .

. . . Here, plaintiff alleges that he had a liberty interest in not being detained for

seven and a half days without adequate procedures in place to ensure that he was released once the reason for his confinement had ended. Defendant argues that plaintiff's confinement was not the result of a deliberately indifferent county custom or policy, but of the Department of Corrections' failure to notify it that plaintiff should be released. This may be correct. Plaintiff argues, however, that defendant has a policy of being deliberately indifferent to the rights of persons who are entitled to release, and asserts that his release was delayed *because of this policy.* Given that no discovery has occurred regarding defendant's policies, and thus that there is no evidence regarding them, it is impossible to resolve this issue on the current record. This is particularly true since plaintiff has adduced evidence that raises triable issues of fact regarding the as yet undisclosed policies.

Specifically, plaintiff argues that defendant was on notice that he was entitled to be released before July 13, 2001, because he told sheriff's deputies on two occasions that the parole hold had been removed at the conclusion of his parole hearing and that he should be released.  The issue is whether a jury could find that this imposed a duty on the LASD to investigate plaintiff's claim, and that the failure to perform the duty constituted "deliberate indifference" to plaintiff's rights. [citations omitted] . . .

. . . Plaintiff alleges that the lack of response to his complaints does evidence deliberate indifference, and courts have held that repeated complaints by an inmate regarding his right to be released can raise a triable issue of fact regarding the deputies' deliberate indifference. See *Armstrong v. Squadrito,* 152 F.3d 564, 568, 580 (7th Cir.1998) (holding that plaintiff's "daily complaints" over a period of more than forty days, and the four to five "inmate request forms" he completed but his guards would not accept, constituted "repeated and increasingly strenuous complaints [that] should have provided the guards with sufficient knowledge to suspect improper confinement and take additional action," and gave rise to "an inference that the guards knew of a serious risk. For the guards to have continued to refuse Armstrong's complaints and for them to have continued only to check the will call list evince[d] the serious possibility of deliberate indifference to Armstrong's plight," and justified denial of defendants' motion for summary judgment); see also *Johnson v. Herman,* 132 F.Supp.2d 1130, 1140–41 (N.D.Ind.2001) (holding that triable issues of fact regarding deliberate indifference precluded summary judgment where plaintiff completed seven "inmate request forms" over a period of ten days, an officer called the court eighteen days after plaintiff was first incarcerated, but received incorrect information from an unknown judicial staff person, and plaintiff remained incarcerated for an additional eight days, during which he submitted seven additional complaint forms).

Plaintiff offers no evidence, however, that the deputies knew there was a substantial risk he was being wrongfully detained, and knowingly failed to investigate.  Moreover, the fact that only two complaints were made is not sufficient to raise a triable issue of fact regarding their deliberate indifference. [citations omitted] . . .

. . . Plaintiff contends he did more than offer verbal protests, however. He asserts that he completed a formal grievance form the day after his parole hearing, complaining that he should be released. Plaintiff proffers no copy of the form; viewing the evidence in the light most favorable to him, however, the court must assume one was filed. Coupled with his verbal protests, the filing of this grievance raises triable issues of fact regarding deliberate indifference. [citations omitted] Had deputies taken action on plaintiff's grievance, they might have

accessed the CLETS system, and seen the Department of Corrections' release of the parole hold recorded there. Follow-up would have confirmed that plaintiff was to be released.

More pertinent to plaintiff's *Monell* claim, there is no evidence in the record regarding defendant's policy for handling the type of grievance plaintiff filed. Stated otherwise, there is no evidence as to what, if anything, the deputies were required to do with a grievance such as plaintiff's, what process, if any, existed for investigating the facts asserted in the grievance, or how long any such process should have taken. Absent such evidence, the court cannot determine whether defendant's policy (or lack of policy) demonstrates deliberate indifference to the rights of overdetained persons such as plaintiff. Triable issues of fact, therefore, remain regarding the reasonableness of defendant's policies.

Green v. Baca, 306 F. Supp. 2d 903, 915–17 (C.D. Cal. 2004).[6]   After making this holding regarding the department's policies, the Green court went on to find there were triable issues regarding whether the delay itself was unreasonable and denied summary judgment on that ground as well:

Given the triable issues of fact that remain as to whether defendant had unconstitutional policies or customs, or an unconstitutional lack of policies, that precluded deputies from discovering that plaintiff was entitled to release prior to July 13, 2001, there are also triable issues of fact as to whether defendant's delay in releasing plaintiff was reasonable.

The court notes, moreover, that even were it to accept defendant's assertion that the LASD had no way of knowing about the release order until July 13, 2001, at 12:44 p.m., it would still be required to deny the motion for summary judgment. As noted above, the Ninth Circuit's decision in *Brass* does not hold that a 39 hour delay between issuance of a release order and actual release is reasonable as a matter of law. In fact, the court in *Brass* faulted the district court for relying on a rule that 48 hours was reasonable as a matter of law . . .

. . .the Ninth Circuit limited its holding to "the circumstances of the case," and did not adopt a *per se* rule that a 39 hour delay was reasonable as a matter of law. *Id.* For the reasons stated in *Brass,* the court similarly cannot adopt a *per se* rule that a twelve and a half hour delay was reasonable as a matter of law.

Rather, the court must, as the Ninth Circuit instructed in *Brass,* look to the "circumstances of the case." *Id.* Here, beyond defendant's general allegations that the LASD needs time to complete certain administrative steps, and, more importantly, to check for wants and holds, defendants offer nothing justifying why it took twelve and a half hours to release plaintiff. Defendant does not attempt to explain why the allegedly necessary administrative steps took twelve

---

[6]   The Court notes that here, while Plaintiff claims he notified Defendants Mendez and Sousa in the Stanislaus County Jail on a daily basis that he had been ordered released, he does not claim he filed any written grievance. (SAC ¶¶ 39-43.)  It is unclear from the complaint what precise date Defendant contacted counsel, however, after the December 18, 2019 transfer to California State Prison, Solano, it appears counsel first contacted the prison on December 30, 2019. (SAC ¶¶ 46-47.)  After the CDCR Defendants verified the minute order authorized Plaintiff's release, Defendants at the prison stated it would take an additional five to seven days to process the release, and Plaintiff was released on January 7, 2020.  (SAC ¶¶ 51, 53.)

and a half hours to complete. Thus, the court can neither find that twelve and a half hours was reasonable or that it was unreasonable. Certainly, it cannot determine reasonableness as a matter of law when defendant has offered only a general assertion that certain steps must be completed prior to release, and provided no explanation as to why those steps are necessary or why they take a particular period of time to complete.

Green, 306 F. Supp. 2d at 917–18. Finally, in Traweek v. Gusman, cited by Plaintiff, the court held Traweek had plausibly alleged a constitutional violation and the defendant prison official was not entitled to qualified immunity:

This case is about state and municipal actors' alleged knowing, deliberate choices not to process Mr. Traweek's release, or adhering to (or failing to adopt) policies deliberately indifferent to his overdetention plight, despite it being clear on the face of his paperwork compared to his state sentencing judgment that he was entitled to immediate release. Mr. Traweek charges that DOC Secretary LeBlanc and DOC employee Jones deprived him of his right to due process by unreasonably prolonging his detention after his court-ordered release . . .

. . . Taking as true his allegations, Mr. Traweek has plausibly alleged that his constitutional right to timely release was violated by both the defendants. There is no dispute that Traweek's incarceration 20 days beyond the term of his court-ordered sentence implicates the due process clause. LeBlanc and Jones are entitled to qualified immunity unless Traweek has alleged facts establishing that they violated his constitutional right to timely release and their actions were objectively unreasonable in light of clearly established law.

Mr. Traweek has alleged facts sufficient to overcome LeBlanc's and Jones's assertions of qualified immunity at the pleadings stage. Mr. Traweek alleges his paperwork (including the OPSO-prepared Letter of Credit, which was created on May 3 and showed he had served his entire seven-month sentence) had not been sent to DOC by OPSO until Thursday, May 17, 2018. That paperwork sat at DOC unreviewed until Monday, May 21, when Ashley Jones "began computing" Traweek's credit and "performing other searches relevant to his release." Notwithstanding Mr. Traweek's allegations indicating that his paperwork and Letter of Credit when compared to his criminal court judgment on its face obviously entitled him to immediate release, it was not until sometime later the next day, Tuesday, May 22, after Traweek's counsel filed a petition for habeas corpus, that Ms. Jones created Mr. Traweek's Certificate of Release; he was released on 3:00 p.m. that day.

Traweek v. Gusman, 414 F. Supp. 3d 847, 860, 866 (E.D. La. 2019). It is noteworthy that in Traweek, the officials failed to investigate or apply the information that was "clear on the face his paperwork" that he was entitled to release in apparent conflict with a court sentencing judgment. Id.

Plaintiff proffers that over-detention beyond two days is presumptively unreasonable.

See Barnes v. District of Columbia, 793 F. Supp. 2d 260 (D.D.C. 2011); Brass, 328 F.3d at 1202. In conjunction with the duty to timely release an inmate, Plaintiff argues prison officials also have a corresponding duty to investigate a prisoner's claim that they are entitled to release. Haygood v. Younger, 769 F.2d 1350, 1357–58 (9th Cir. 1985); Alexander v. Perrill, 916 F.2d 1392, 1398 (9th Cir. 1990).  These cases involve prison officials that incorrectly kept prisoners over their release date, five years in the case of Haywood, despite protestations to the prison officials that they were incorrect in their sentence calculations.  769 F.2d 1350 at 1357–58. Although the circumstances involved arguably more discretional acts with disputes over sentence calculations that the officials were involved in, they are instructive.[7]   The Ninth Circuit held Haygood stated a Section 1983 claim for violation of due process:

> In the context of the facts of the case at bar, Haygood served most of his time in custody executing sentences pronounced by courts exercising the essence of due process of law. Haygood continued to serve time in custody after his correct release date had passed because his keepers did not believe that he was entitled to be released. Whether this behavior on the part of his keepers was negligent or intentional, Haygood's keepers knew that he was protesting his retention in custody. The officers believed that their understanding of the statutes was superior to his. Haygood's response was habeas corpus. This took time. In the ordinary course of state court litigation, Haygood established, nearly five years after he should have been released and 17 months after his protests were known, that his view of the matter was more nearly correct than was that of his keepers.

> The record in Haygood's case revealed that he had been afforded due process before each of his sentences was imposed. Thus he was properly convicted of

---

[7]   In reply briefing, Defendant does not specifically cite to or argue that these cases are inapplicable or distinguishable to the circumstances at hand.  (See Reply generally, ECF No. 38.)  Defendant does generally aver that "Plaintiff cites a number of cases in his opposition involving the issue of overdetention by jail and prison officials . . . However, virtually all these cases are distinguishable from the facts in this case, as their facts involve allegations of overdetention by the actual agency in custody of the prisoner or arrestee." (Reply 4.)  Defendants then emphasize, in briefing and at oral argument, that in Davis v. Hall, 375 F.3d 703 (8th Cir. 2009), the plaintiff remained at the county jail for four (4) days before he was returned to state prison, where he remained for over 50 days after his ordered release.  The state and county defendants both moved for summary judgment based on qualified immunity.  The district court granted qualified immunity for the county defendants, granting their motion for summary judgment.  The only issue addressed in the Eighth Circuit's opinion was denial of qualified immunity for the state defendants; it did not address the district court's granting of qualified immunity to the county defendants.  Thus, Defendants argue the most factually analogous case cited by Plaintiff actually supports the County Defendants' position that there is no liability against the County Defendants in this case.
Despite Defendants' correct assertion that the case involved a smaller time in the county facility before being transferred to the state prison is somewhat analogous to the facts at hand here, for the reasons explained herein, the fact that the Plaintiff was in the constructive custody of the CDCR under a California statute, is not determinative, and the Court finds Plaintiff has stated a plausible claim for violation of the Fourteenth Amendment by Defendants Mendez and Sousa, and they have not demonstrated an entitlement  to qualified immunity at this stage of the litigation.

escape, and properly sentenced. The denial of due process occurred when state officers, through established interpretations of the regulations for setting release dates, without affording Haygood an opportunity to be heard, chose to extend his custodial period. This de facto government policy gave rise to a § 1983 claim against Records Officers Cranke and Seymour approximately seventeen months before Haygood's litigation established the proper release date. When Haygood finally, by means of habeas corpus, came before the state Supreme Court, he obtained the judgment holding that he should have been released five years earlier. This was remedial, or postdeprivation, relief in part at least, but it did not satisfy the *Logan, Morrissey,* and *Mathews* line of cases that require a hearing before the rights are taken away. For these reasons, we hold that Haygood has stated a § 1983 claim for damages for denial of liberty without due process of law. The remaining question is whether the defendants still in the case had a qualified immunity defense as a matter of law, or whether a triable issue of fact remained to be resolved.

Haygood, 769 F.2d at 1357–58 (upholding jury instruction as to qualified immunity and monetary award to plaintiff Haygood).  The Ninth Circuit later compared Haygood's facts to another case wherein the court determined officials were deliberately indifferent despite the fact that Alexander's protests were not clearly meritorious, and responded to his objections:

It is worth noting that in Haygood's case, as here, the plaintiff's argument that he was entitled to be released from prison was not clearly meritorious from the face of the objections he lodged with the prison officials. After the California prison officials decided which of Haygood's four separate sentences should run consecutive or concurrent to each of the others, Haygood objected to the determination. The prison officials spoke with each other and responded to Haygood's objections in writing. They attached an opinion from the state attorney general that they believed to be supportive of their letter. *Haygood,* 769 F.2d at 1353. Nonetheless, we concluded that the prison officials were deliberately indifferent to Haygood's constitutional rights because they failed to address his credible evidence that he was entitled to release. *Id.* at 1355.

Here, as in *Haygood,* the defendants' responsibilities included ensuring the proper calculation of prison sentences. Nevertheless, when faced with the possibility that a mistake was made, they did nothing to attempt to determine whether Alexander's claim was meritorious. We simply will not, as the defendants urge, embrace a rule which would allow prison officials to stand by idly after an inmate has raised the prospect that he is being unlawfully incarcerated and has provided documentary evidence in support of his claim. Thus, we reaffirm our decision in *Haygood* that prison officials who are under a duty to investigate claims of computational errors in the calculation of prison sentences may be liable for their failure to do so when a reasonable request is made.

Alexander v. Perrill, 916 F.2d 1392, 1398 (9th Cir. 1990) (footnote omitted).

Against this backdrop of caselaw, Plaintiff emphasizes the following facts: on December 13, 2019, in case number 1480530, Judge Ashley ordered that Plaintiff "was to be processed, immediately released, and was to report to parole," (SAC ¶¶ 32-35); the Sheriff's Office received

1   a copy of the order that day (SAC ¶ 38); a Sheriff's Office deputy personally signed the order,

2   certifying the order "to be a correct abstract of the judgment made in the action," (SAC ¶ 35,

3   image of deputy's signature and certification); despite the order that Plaintiff be "immediately

4   released," Defendant Mendez then waited two days to contact the CDCR and the CDCR then

5   asked Mendez to return Plaintiff to the CDCR based on a CDCR detainer for case 1480530 (SAC

6   ¶ 40); according to County Defendants, Mendez and Sousa then followed CDCR's "instructions"

7   and returned Plaintiff to CDCR possession on December 18, 2019 (Defs.' Mot. at 8).   Plaintiff

8   argues he did not sit on his hands while this happened, and throughout this entire period,

9   "informed jail staff daily that the judge had ordered him released," (SAC ¶¶ 39, 43), and County

10   Defendants do not deny the allegations in the complaint that Mendez and Sousa were

11   subjectively aware of Judge Ashley's release order but chose to follow the CDCR's request

12   instead (SAC ¶ 41).   (Opp'n 5.)

13          Based on the caselaw provided by both parties as summarized above, and the facts

14   alleged in the complaint, the Court finds Plaintiff has stated a plausible Section 1983 claim for

15   the violation of his due process rights under the Fourteenth Amendment.   The Court finds

16   Plaintiff's complaint establishes the potential violation of the due process right to be released

17   within a reasonable time after the reason for the detention has ended.   See, e.g., Baker, 443 U.S.

18   at 144–46; Brass, 328 F.3d at 1200; Green, 306 F. Supp. 2d at 915–17; Driver, 859 F.3d at 491–

19   92.

20          Although Plaintiff claims he notified Defendants in the Stanislaus County Jail on a daily

21   basis that he had been ordered released, the Court notes that he does not claim he filed any

22   written grievance (SAC ¶¶ 39-43), which arguably cuts against his claim.   See Green, 306 F.

23   Supp. 2d at 915–17 ("Moreover, the fact that only two complaints were made is not sufficient to

24   raise a triable issue of fact regarding their deliberate indifference. . . Plaintiff contends he did

25   more than offer verbal protests [and] asserts that he completed a formal grievance form the day

26   after his parole hearing, complaining that he should be released.").   Nonetheless, although not

27   stated clearly as to how many times for each Defendant in the complaint, Plaintiff alleges he

28   informed these Defendants repeatedly of the fact he was supposed to be released following the

court proceeding, specifically alleging: "During the time he was incarcerated in Stanislaus County Jail, Mr. McDaniel informed Defendants on a daily basis that he had been ordered released, to no avail." (SAC ¶ 43.) The Court finds these allegations are sufficient to state a plausible claim against Defendants Mendez and Sousa. See Green, 306 F. Supp. 2d at 915–17 ("Specifically, plaintiff argues that defendant was on notice that he was entitled to be released before July 13, 2001, because he told sheriff's deputies on two occasions that the parole hold had been removed at the conclusion of his parole hearing and that he should be released. The issue is whether a jury could find that this imposed a duty on the LASD to investigate plaintiff's claim, and that the failure to perform the duty constituted 'deliberate indifference' to plaintiff's rights.").

Although Defendants Mendez and Sousa were only potentially involved with Plaintiff's overdetention for a period of approximately three to four days, a shorter period of time then detained by the CDCR Defendants, this may very well likely be beyond a permissible period of time. Berry v. Baca, 379 F.3d 764, 771–72 (9th Cir. 2004) ("Applying *McLaughlin's* stringent proof requirement to post-release detentions of less than forty-eight hours would be difficult to reconcile with the fact that, for the plaintiffs at issue here, there has been a judicial determination that they are entitled to freedom from the criminal justice system. Thus, the societal interest in the processes that result in delay, while significant, may not be as weighty as in the probable cause context . . . Like *Brass* and *Lewis*, we decline to determine a number of hours that is presumptively reasonable for post-release over-detentions. In light of the case law on both post-release over-detentions and *Monell* claims of deliberate indifference, we find no basis for holding the detentions at issue presumptively reasonable as a matter of law."); Barnes, 793 F. Supp. 2d at 276 ("In recognition of these facts, courts appear to agree that the maximum permissible administrative delay in the overdetention context likely falls well short of the 48–hour horizon set out in *McLaughlin.*") (citing Berry, 379 F.3d at 771-72; Brass, 328 F.3d at 1202); see also Lewis, 853 F.2d at 1370 (7th Cir. 1988) ("We recognize that the administrative tasks incident to a release of a prisoner from custody may require some time to accomplish . . . Reasonable time must be allowed for such matters as transportation, identity verification, and processing. It is

1   virtually impossible to establish an absolute minimum time to meet all potential circumstances

2   which might exist.  What is a reasonable time for detaining a prisoner in custody is a question

3   best left open for juries to answer based on the facts presented in each case."); Driver, 859 F.3d

4   at 491–92 ("The district court erred in applying the 48-hour presumption to this context and in

5   relying on it as a basis to deny class certification . . . The class proposed by the plaintiffs

6   involved a markedly different situation. It is composed of persons for whom legal authority for

7   detention has ceased, whether by acquittal after trial, release on recognizance bond, completion

8   of jail time in the sentence, or otherwise. For those persons, all that is left is for the officials to

9   merely process the release.").

10         As noted above, Defendants argue the California Penal Code § 2690.5 makes clear that a

11   CDCR prisoner remains a CDCR prisoner even when ordered out to court and temporarily held

12   at the county jail, and emphasize Plaintiff's complaint alleges he was a CDCR prisoner with a

13   detainer placed on him before transferred to the Stanislaus County Jail for court proceedings, and

14   after the hearing, Mendez contacted a CDCR employee at CDCR who advised him Plaintiff

15   should be returned to CDCR custody.  (Mot. 12.)  Plaintiff responds that Defendants' argument

16   is improperly based on the idea that CDCR's request absolves Mendez and Sousa of liability, as

17   while they admit that they chose to follow the CDCR's request over the order of the judge of the

18   state court, they provide no authority in support of their position, as state agencies and sheriffs do

19   not get to choose to ignore a court order.  (Opp'n 5-6, citing California Const., Art. VI, Sec. 1

20   ("The judicial power of this State is vested in the Supreme Court, courts of appeal, and superior

21   courts, all of which are courts of record."); McHugh v. Santa Monica Rent Control Bd., 49 Cal.

22   3d 348, 356 (1989) ("[A]gencies not vested by the Constitution with judicial powers may not

23   exercise such powers.").)

24         Although the interactions with CDCR may allow a jury to weigh the reasonableness of

25   the Defendants' actions, the Court is not persuaded that CDCR having constructive custody of

26   Plaintiff under the California penal code would absolve Defendants Mendez and Sousa of

27   liability here for a constitutional violation.  Aside from the penal code, Defendants cite no

28   authority to the Court for the proposition that the retention of constructive custody by the CDCR

1 would absolve members of the Stanislaus County jail of Section 1983 liability when Plaintiff was

2 in the actual physical custody of the Stanislaus County Jail.  The Court would recommend not

3 extending such rationale here.  Such a proposition appear to have far-reaching impacts on the

4 applicability of ensuring actors are held liable for constitutional violations when in the physical

5 custody of the agency.

6        The cases cited by Defendants do not convince the Court that Plaintiff is unable to state a

7 claim against Defendants Sousa and Mendez for violation of the Fourteenth Amendment.  West

8 v. Tillman, does suggest to the Court that Plaintiff may not be able to show anything more than

9 negligence occurred, but the Court believes such decision is more appropriate for possible

10 summary judgment following further discovery on what precisely occurred, as taking the

11 allegations as true, Plaintiff has demonstrated a plausible cause of action.  See West, 496 F.3d at

12 1327 ("Defendant Whitton had been employed at the Jail for only a few weeks . . . entered some

13 of the relevant information into the computer system but failed to deliver the jail card to the

14 docketing room [and plaintiff] pointed to no evidence showing that Whitton subjectively knew

15 that her acts would lead to West's over-detention or that she disregarded any such risk . . .

16 although Defendant Davis was an experienced records specialist and testified that she understood

17 the risks associated with her duties, nothing evidences that her failure to ensure that West's jail

18 card reached the docket room resulted from anything more than negligence [and] Davis testified

19 that the West release papers simply "fell between the gaps" because of the volume of work in the

20 records room, and testimony from other Jail staff supports her assertion.").  As noted above,

21 important to the Supreme Court's holding in Baker was the fact that the sheriff executed a

22 warrant that was presumably valid, and there was no duty at that juncture to investigate the claim

23 of mistaken identity as that role is reserved for the judge and jury.  Baker, 443 U.S. at, 145-146.

24        Finally, as noted above, Defendants contend the complaint is silent on this issue as there

25 are no allegations to indicate the County Defendants knew or should have known that case

26 number 1480530 was the only prison sentence Plaintiff was serving in CDCR, and thus

27 Defendants submit that when there are two possible explanations for events, only one of which

28 can be true and only one of which results in liability, a plaintiff must offer more than allegations

that are "merely consistent with" their favored explanation but also consistent with the alternative explanation, In re Century Aluminum Co. Securities Litigation, 729 F.3d 1104, 1108 (9th Cir. 2013). (Mot. 13.)  The case cited by Defendants for this argument is not persuasive in the particular context of this case.  The possibility that Plaintiff was serving another sentence does not exclude the possibility that these Defendants failed to investigate Plaintiff's circumstances or violated the due process right to be released within a reasonable time.  The case cited involved a specific issue encountered with stock sales under multiple offerings, and the implausibility of demonstrating certain circumstances, as relevant to Iqbal:

> These allegations do not give rise to a reasonable inference that plaintiffs' shares are traceable to the secondary offering. Accepting the allegations as true, plaintiffs' shares could have come from the secondary offering, but the "obvious alternative explanation" is that they could instead have come from the pool of previously issued shares. Twombly, 550 U.S. at 567, 127 S.Ct. 1955. Plaintiffs' allegations are consistent with their shares having come from either source. When faced with two possible explanations, only one of which can be true and only one of which results in liability, plaintiffs cannot offer allegations that are "merely consistent with" their favored explanation but are also consistent with the alternative explanation. Iqbal, 556 U.S. at 678, 129 S.Ct. 1937 . . .
>
> . . . .When a company has issued shares in multiple offerings under more than one registration statement, however, a greater level of factual specificity will be needed before a court can reasonably infer that shares purchased in the aftermarket are traceable to a particular offering.  Making this determination is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Iqbal, 556 U.S. at 679, 129 S.Ct. 1937. As noted earlier, experience and common sense tell us that when a company has offered shares under more than one registration statement, aftermarket purchasers usually will *not* be able to trace their shares back to a particular offering. Thus, in this case, plaintiffs had to allege facts from which we can reasonably infer that their situation is different. Standing alone, the conclusory allegation that plaintiffs "purchased Century Aluminum common stock directly traceable to the Company's Secondary Offering" does not allow us to draw a reasonable inference about anything because it is devoid of factual content.

In re Century Aluminum Co. Sec. Litig., 729 F.3d at 1107–08.

Accordingly, for all of the above reasons, the Court recommends Defendants' motion to dismiss Plaintiff's first cause of action against Defendants Mendez and Sousa be denied.

### B. Whether Plaintiff's Fifth Cause of Action Fails to State a 42 U.S.C. Section 1983 Claim under Monell against Sheriff Dirkse

Defendants move to dismiss Plaintiff's fifth cause of action against Sheriff Dirkse on the basis that Plaintiff's complaint does not contain allegations sufficient to state a Monell claim.

(Mot. 13.)

  1.  <u>The Parties' Arguments</u>

  Defendants concede that the Ninth Circuit has recognized that sheriffs in California have final policy-making authority over county jail policies and thus may be subject to <u>Monell</u> liability claims, <u>Cortez</u>, 294 F.3d at 1189; <u>Streit v. County of Los Angeles</u>, 236 F.3d 552, 561–63 (9th Cir. 2001).  (Mot. 14.)  Defendants argue that isolated events or random acts are not sufficient to establish custom or policy and the fifth cause of action fails because Plaintiff alleges only a single incident—his temporary detention at the jail at issue in this case—which is insufficient as "evidence" of a policy or custom under <u>Monell</u>, and that Plaintiff has failed to offer any evidence that the County maintains a custom or policy of "overdetaining" CDCR prisoners, or any prisoners, at the Stanislaus County Jail.  (Mot. 14.)  Defendant emphasizes that Plaintiff does not allege facts indicating Sheriff Dirkse was aware of any training deficiencies or was otherwise put on notice that any prisoners at the jail were being detained after court-ordered releases.  (Mot. 15.)  Defendant argues that Plaintiff's allegation regarding a "practice and policy of relying on information from other jailers rather than orders form a court demonstrates a pattern and practice of overdetention" (SAC ¶ 85), is nothing more than a formulaic recitation insufficient to support a <u>Monell</u> claim, and his allegations are insufficient to support a claim based on failure to train, supervise or discipline.  (Mot. 15-16.)

  Plaintiff responds that it is at least plausible that Mendez's and Sousa's actions flowed from the policy, custom, or training of the Sheriff's Department, as corroborated by the County Defendants' argument that they were "doing things by the book."  In response to Defendants' argument that a single incident is insufficient, Plaintiff emphasizes that this action is only at the pleading stage and must only provide enough factual material to make a claim plausible on its face, <u>Iqbal</u>, 556 U.S. at 678.  (Opp'n 8.)  Plaintiff argues that it is absolutely plausible that Mendez's and Sousa's actions were the policy or practice of the Sheriff's Office because nowhere in the factual narrative is there any suggestion that their actions were unusual, and in fact, the County Defendants argue in their motion that Mendez and Sousa did everything correctly (Defs.' Mot. 12), which supports the inference that this is how things are done at the

1   Sheriff's Office pursuant to the Sheriff's policy, in line with Plaintiff's allegation of a policy or

2   practice of following information from other jailors rather than judges (SAC ¶ 85).   (Opp'n 8.)

3   Alternatively, as the complaint alleges, Sheriff Dirkse failed to train his staff properly in

4   understanding that a judge's order controls over a CDCR request.   (Opp'n 8.)   Thus, Plaintiffs

5   argue that Defendants cannot have it both ways: they cannot try to exonerate Mendez and Sousa

6   by arguing they did everything correctly by the book, while also trying to exonerate Sheriff

7   Dirkse by arguing that it is not plausible that Mendez and Sousa's actions were the practice,

8   training, or policy of the department.   (Opp'n 8-9.)[8]

9           2.       General Legal Standards

10          "A local governmental entity is liable under § 1983 when action pursuant to official

11  municipal policy of some nature cause[s] a constitutional tort."   Oviatt By & Through Waugh v.

12  Pearce, 954 F.2d 1470, 1473–74 (9th Cir.1992) (quoting Monell v. Dep't of Social Servs., 436

13  U.S. 658, 691 (1978)) (internal quotations omitted) (alteration in original).   In order to state a

14  Monell claim against a government official in his official capacity, a plaintiff must establish

15  "that the official (1) had final policymaking authority concerning the action alleged to have

16  caused the particular constitutional or statutory violation at issue [;] and (2) was the policymaker

17  for the local governing body for the purposes of the particular act."   Cortez v. County of Los

18  Angeles, 294 F.3d 1186, 1189 (9th Cir. 2002) (internal quotations  and citations omitted).

19          "A municipality's failure to train an employee who has caused a constitutional violation

20  can be the basis for § 1983 liability where the failure to train amounts to deliberate indifference

21  to the rights of persons with whom the employee comes into contact."   Long v. Cty. of Los

22  Angeles, 442 F.3d 1178, 1186 (9th Cir. 2006) (citing City of Canton, Ohio v. Harris, 489 U.S.

23  378, 388 (1989)).   "The issue is whether the training program is adequate and, if it is not,

24  whether such inadequate training can justifiably be said to represent municipal policy."   Id.   "A

25  _____

    [8]  Plaintiff further argues that it is not the case that Plaintiff only alleges a single incident, because as Defendants
26  acknowledge, Plaintiff "informed Defendants on a daily basis that he had been ordered released."   (ECF No. 31 at ¶
    43.)  Plaintiff emphasizes that not one of these five or more complaints resulted in a Sheriff's Office employee
27  investigating his complaint and effecting his release, which supports a plausible inference of a pattern or lack of
    training.  (Opp'n 9.)  The Court does not find Plaintiff's argument that this translates to more than a single incident
28  convincing.

                                                      33

plaintiff alleging a failure to train claim must show: (1) he was deprived of a constitutional right, (2) the municipality had a training policy that amounts to deliberate indifference to the [constitutional] rights of the persons' with whom [its police officers] are likely to come into contact; and (3) his constitutional injury would have been avoided had the municipality properly trained those officers." Young v. City of Visalia, 687 F. Supp. 2d 1141, 1148 (E.D. Cal. 2009) (citations and quotation marks omitted) (alteration in original). A plaintiff also might succeed in proving a failure-to-train claim without showing a pattern of constitutional violations where "a violation of federal rights may be a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations." Long, 442 F.3d at 1186 (quoting Bd. of Cty. Comm'rs of Bryan Cty., Okl. v. Brown, 520 U.S. 397, 398, 117 S. Ct. 1382, 1385, 137 L. Ed. 2d 626 (1997)).

"Allegations of *Monell* liability will be sufficient for purposes of Rule 12(b)(6) where they: (1) identify the challenged policy/custom; (2) explain how the policy/custom is deficient; (3) explain how the policy/custom caused the plaintiff harm; and (4) reflect how the policy/custom amounted to deliberate indifference, i .e. show how the deficiency involved was obvious and the constitutional injury was likely to occur." Lucas v. City of Visalia, No. 1:09-CV-1015AWIDLB, 2010 WL 1444667, at *4 (E.D. Cal. Apr. 12, 2010) (citations omitted); see also Young, 687 F. Supp. 2d at 1149 (stating the allegations in the pre-Iqbal case of Lee v. City of Los Angeles, 250 F.3d 668, 681 (9th Cir. 2001), which met these four prongs, "would still pass muster" following Iqbal).

"A supervisor may be liable only if (1) he or she is personally involved in the constitutional deprivation, or (2) there is 'a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation.' " Crowley, 734 F.3d at 977 (citation and internal quotation marks omitted). "Under the latter theory, supervisory liability exists even without overt personal participation in the offensive act if supervisory officials implement a policy so deficient that the policy itself is a repudiation of constitutional rights and is the moving force of a constitutional violation." Id.; see also Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989) ("A supervisor is only liable for constitutional violations of his subordinates if the

supervisor participated in or directed the violations, or knew of the violations and failed to act to prevent them."); accord Starr v. Baca, 652 F.3d 1202, 1205–06 (9th Cir. 2011); Corales v. Bennett, 567 F.3d 554, 570 (9th Cir. 2009).

      3.    The Court finds Plaintiff's Fifth Cause of Action States a Claim Against Dirkse in an Official Capacity but Fails to Allege a Plausible Claim Against Dirkse in an Individual Capacity

Plaintiff's fifth cause of action is brought under the Fourteenth Amendment and Monell against Defendant Dirkse, only, for failure to train and supervise. (SAC ¶¶ 82-86.) Plaintiff's complaint alleges: (1) Defendant Dirkse had a duty arising under the Fourteenth Amendment to adequately train, supervise and discipline all prison and jail personnel in order to prevent overdetention of prisoners; (2) Defendant was deliberately indifferent to their duties to properly train, discipline and supervise the jail staff; (3) Defendant declined to implement sufficient training, sufficient policies, or any legitimate mechanism for oversight or punishment of officers and agents; (4) the Sheriff's office's practice and policy of relying on information from other jailers rather than orders from a court demonstrates a pattern or policy of overdetention; (5) as a result of Defendant's actions and omissions, including his failure to train, supervise and discipline staff, Plaintiff was overdetained. (Id.)

The Court finds the allegations underlying the fifth cause of action are essentially a general recitation of the elements of a cause of action without specific factual allegations, until paragraph 85. (SAC ¶ 82-86.) The most specific allegation that Plaintiff makes is that "the Sheriff's office's practice and policy of relying on information from other jailers rather than orders from a court demonstrates a pattern or policy of overdetention." (SAC ¶ 85.)

      **a.    Official Capacity**

A suit brought against government officials in their official capacity is generally equivalent to a suit against the government itself. See, .e.g., McRorie v. Shimoda, 795 F.2d 780, 783 (9th Cir. 1986).

As for the claim against Dirkse in an official capacity, the Court finds Plaintiff's complaint states a claim. Although this is a close question, the Court finds Plaintiff's complaint states just enough to move the allegations above a threadbare recitation of the elements of a

claim, particularly given no discovery has been obtained as of yet, and the allegation in paragraph 85 is supported by the rest of Plaintiff's factual allegations.  See Green v. Baca, 306 F. Supp. 2d at 915–17 (denying summary judgment noting: "Defendant argues that plaintiff's confinement was not the result of a deliberately indifferent county custom or policy, but of the Department of Corrections' failure to notify it that plaintiff should be released.  This may be correct.  Plaintiff argues, however, that defendant has a policy of being deliberately indifferent to the rights of persons who are entitled to release, and asserts that his release was delayed because of this policy.  Given that no discovery has occurred regarding defendant's policies, and thus that there is no evidence regarding them, it is impossible to resolve this issue on the current record.  This is particularly true since plaintiff has adduced evidence that raises triable issues of fact regarding the as yet undisclosed policies.  Specifically, plaintiff argues that defendant was on notice that he was entitled to be released before July 13, 2001, because he told sheriff's deputies on two occasions that the parole hold had been removed at the conclusion of his parole hearing and that he should be released.  The issue is whether a jury could find that this imposed a duty on the LASD to investigate plaintiff's claim, and that the failure to perform the duty constituted "deliberate indifference" to plaintiff's rights.");  Manzo v. Cty. of Riverside, No. EDCV1701165JGBSPX, 2018 WL 6016970, at *9 (C.D. Cal. Jan. 23, 2018) ("Plaintiff now explains how the training was deficient: His SAC alleges deficiencies 'in the area of conducting more frequent safety checks, dayroom inspections to watch for threatening conduct/behavior by inmates and segregation of violent inmates from vulnerable inmates.' [citation] Plaintiff now connects the dots between the training deficiencies and Plaintiff's injuries.  Thus, the Court finds Plaintiff has pled sufficient facts to state a claim.");  Long, 442 F.3d at 1186 (A plaintiff may succeed on a failure-to-train claim without showing a pattern where violation of rights "may be a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations.") (quoting Bd. of Cty. Comm'rs of Bryan Cty., Okl., 520 U.S. at 398).

    "A policy can be one of action or inaction."  Long, 442 F.3d at 1185.  "To impose liability against a county for its failure to act, a plaintiff must show: (1) that a county employee

1  violated the plaintiff's constitutional rights; (2) that the county has customs or policies that

2  amount to deliberate indifference; and (3) that these customs or policies were the moving force

3  behind the employee's violation of constitutional rights." Id. at 1186; see also Green, 306 F.

4  Supp. 2d at 917–18 ("Given the triable issues of fact that remain as to whether defendant had

5  unconstitutional policies or customs, or an unconstitutional lack of policies, that precluded

6  deputies from discovering that plaintiff was entitled to release prior to July 13, 2001, there are

7  also triable issues of fact as to whether defendant's delay in releasing plaintiff was reasonable.").

8  Similar to excessive force claims with police officers, given how frequently the employees at the

9  jail deal with transfer and release orders impacting inmates following court appearances, the

10  allegations appear sufficient to show deliberate indifference. See Lacy v. Cty. of San Diego, No.

11  12-CV-624-MMA JMA, 2012 WL 4111507, at *3 (S.D. Cal. Sept. 18, 2012) ("As the Eastern

12  District of California has noted, given the allegations regarding the Defendant Deputies' conduct

13  [of excessive force], this is a sufficient allegation of deliberate indifference.") (citing Lucas v.

14  City of Visalia, No. 1:09-CV-1015AWIDLB, 2010 WL 1444667, at *4 (E.D. Cal. Apr. 12, 2010)

15  ("Considering how frequently police officers are called upon to utilize force, the absence of

16  policies/practices regarding monitoring the use excessive force could amount to deliberate

17  indifference.").

18        **b.   Individual Capacity**

19        The Court finds Plaintiff's fifth cause of action has not alleged facts to state a claim for

20  against Defendant Dirkse in an individual capacity, as he has not alleged any specific facts

21  demonstrating Dirkse's "own culpable action or inaction in the training, supervision, or control

22  of his subordinates; for his acquiescence in the constitutional deprivation; or for conduct that

23  showed a reckless or callous indifference to the rights of others." Starr v. Baca, 652 F.3d 1202,

24  1207–08 (9th Cir. 2011) (quoting Watkins v. City of Oakland, 145 F.3d 1087, 1093 (9th Cir.

25  1998); see also Manzo, 2018 WL 6016970, at *11–13 ("Here, Plaintiff does not allege that

26  Supervisory Defendants personally participated in Plaintiff's treatment.   Instead, Plaintiff

27  presumably alleges that Supervisory Defendants are liable because they knew of deputies'

28  constitutional violations and failed to take any remedial action to train or supervise. 'Even under

1    a deliberate indifference theory of individual liability, the Plaintiffs must still allege sufficient

2    facts to plausibly establish the defendant's 'knowledge of' and acquiescence in the

3    unconstitutional conduct of his subordinates.' ") (quoting <u>Hydrick v. Hunter</u>, 669 F.3d 937, 942

4    (9th Cir. 2012)).

5        Plaintiff generally alleges that Dirkse was deliberately indifferent and "declined" to

6    implement sufficient training or policies, however these facts are insufficient he knew,

7    acquiesced in, or ratified their actions, and are "bald and conclusory allegations [that] are

8    insufficient to establish individual liability under 42 § 1983."  <u>Manzo</u>, 2018 WL 6016970, at

9    *11–13 ("Here, Plaintiff hangs his hat on Supervisory Defendants knowledge of the RPDC

10   Crime Study, the incident involving Mr. Soriano, and the Consent Decree, presumably claiming

11   that as a result, Supervisory Defendants were aware of deputies' unconstitutional acts . . . In

12   contrast with the SAC here, the complaint in <u>Starr</u> specifically alleged numerous incidents in

13   which Los Angeles County jail inmates had been killed or injured as a result of the actions of

14   employees (subordinates of Sheriff Baca) . . . [t]he plaintiff there specifically alleged that Sheriff

15   Baca had notice of these incidents and did not take action to protect inmates . . . For instance, the

16   complaint in <u>Starr</u> alleged that Sheriff Baca was informed of the abuse of inmates  . . . [and] [of

17   particular note, Sheriff Baca was made aware of specific incidents, as pled in the complaint, of

18   these failures by the deputies."); <u>see also</u> <u>Vivanco v. California Dep't of Corr. & Rehab.</u>, No.

19   117CV00434LJOBAM, 2017 WL 2547026, at *4 (E.D. Cal. June 13, 2017) ("There is no

20   allegation that Mr. Frauenheim personally participated in any alleged conduct, and the complaint

21   does not allege that Mr. Frauenheim was aware that PVSP staff was not adhering to the policy

22   regarding welfare checks.  General allegations that do not establish a link between the conduct

23   alleged and specific defendants do not meet the minimal pleadings required to defend against a

24   Rule 12(b)(6) motion. [citation] Since any potential liability is based upon Mr. Frauenheim's

25   actions, Plaintiff must allege with specificity what he knew and did, not what Defendants in

26   general knew and did."); <u>Cavanaugh v. Cty. of San Diego</u>, No. 3:18-CV-02557-BEN-LL, 2020

27   WL 6703592, at *27–28 (S.D. Cal. Nov. 12, 2020) ("Even in the face of the egregiously

28   improper soft count in *Vivanco*, the supervisory defendants were still not held liable because the

1  plaintiff failed to plead the defendant's role in the alleged constitutional violations (beyond mere

2  conclusory allegations).   The Third Claim for Relief in Plaintiffs' SAC suffers from the same

3  deficiencies.").

4         **c.      Recommendation as to the Fifth Cause of Action**

5         Accordingly, the Court recommends granting Defendants' motion to dismiss Plaintiff's

6  fifth cause of action against Defendant Dirkse in an individual capacity, and denying

7  Defendants' motion to dismiss Plaintiff's fifth cause of action against Defendant Dirkse in an

8  official capacity.   See <u>Manzo</u>, 2018 WL 6016970 (dismissing claim in individual capacity but

9  denying motion to dismiss claim in official capacity).

10        **C.      Whether Defendants are Entitled to Qualified Immunity**

11        Defendants Mendez, Sousa, and Dirkse, in an individual capacity, move for dismissal on

12 the ground they are entitled to qualified immunity for any alleged Fourteenth Amendment

13 violation.  (Mot. 16.)  The Court has already recommended Defendant Jeff Dirkse be dismissed

14 from this action in his individual capacity, <u>supra</u>, Section III(A)-(B), and thus the Court will not

15 address whether Defendant Dirkse would be entitled to qualified immunity.

16        Defendants argue that while jail detention cases with somewhat similar facts exist,

17 discussed above, <u>supra</u>, Section IIII(A), there does not appear to be any case or law that would

18 have put the County Defendants on notice that their actions violated clearly established law

19 under the circumstances in this case.  (Mot. 17.)  Defendants emphasize the existing precedent

20 must be sufficiently particularized such that the unlawfulness of the defendant's actions would

21 be "apparent" and "beyond debate," and as to Defendants Mendez and Sousa, allegations

22 indicate they knew that Plaintiff was a CDCR prisoner, CDCR had placed a detainer on Plaintiff,

23 and Plaintiff was being temporarily held at the jail for county court proceedings.  (<u>Id.</u>)  The

24 superior court's October 24, 2019 order commanded Stanislaus County to return Plaintiff to

25 CDCR custody after completion of court proceedings, and CDCR instructed them to return

26 Plaintiff to CDCR custody on December 15, 2019, after the superior court ordered Plaintiff

27 released on parole for case number 1480530.  (SAC ¶¶ 26, 40.)  Defendants contend that based

28 on these facts, existing law would not have made it "apparent" that these County Defendant's

1   actions were unlawful, nor "placed the statutory or constitutional question beyond debate.  (Mot.

2   17.)

3        Plaintiff does not directly address qualified immunity in a separate section of the

4   opposition brief, but appears to incorporate relevant argument when addressing Defendants'

5   arguments in Section A.  (Pls.' Opp'n 7.)

6        The doctrine of qualified immunity protects government officials from civil liability

7   where "their conduct does not violate clearly established statutory or constitutional rights of

8   which a reasonable person would have known."  Pearson v. Callahan, 555 U.S. 223, 231 (2009)

9   (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).  " 'Qualified immunity gives

10  government officials breathing room to make reasonable but mistaken judgments,' and 'protects

11  all but the plainly incompetent or those who knowingly violate the law.' "  Stanton v. Sims, 571

12  U.S. 3, 6 (2013) (citations omitted).

13       To determine if an official is entitled to qualified immunity the court uses a two part

14  inquiry.  Saucier v. Katz, 533 U.S. 194, 200 (2001).  The court determines if the facts as alleged

15  state a violation of a constitutional right and if the right is clearly established so that a reasonable

16  official would have known that his conduct was unlawful.  Saucier, 533 U.S. at 200.  A district

17  court is "permitted to exercise their sound discretion in deciding which of the two prongs of the

18  qualified immunity analysis should be addressed first in light of the circumstances in the

19  particular case at hand."  Pearson, 555 U.S. at 236.  The inquiry as to whether the right was

20  clearly established is "solely a question of law for the judge."  Dunn v. Castro, 621 F.3d 1196,

21  1199 (9th Cir. 2010) (quoting Tortu v. Las Vegas Metro. Police Dep't. 556 F.3d 1075, 1085 (9th

22  Cir. 2009)).

23       It is not required that there be a case directly on point before concluding that the law is

24  clearly established, "but existing precedent must have placed the statutory or constitutional

25  question beyond debate."  Stanton, 134 S.Ct. at 5 (quoting Ashcroft v. al–Kidd, 131 S.Ct. 2074,

26  2085 (2011).  A right is clearly established where it is "sufficiently clear that every reasonable

27  official would [have understood] that what he is doing violates that right."  Hines, 914 F.3d at

28  1229 (quoting Reichle v. Howards, 566 U.S. 658, 664 (2012)).  In determining if the right is

40

clearly established, the court must consider the law, "in light of the specific context of the case, not as a broad general proposition." Hines, 914 F.3d at 1229 (Mullenix v. Luna, 136 S.Ct. 305, 308 (2015)).

The Court recommends denying, without prejudice to renewal at summary judgment, Defendants' motion to dismiss based on qualified immunity at this stage of the proceedings. It is true that issues of qualified immunity should be resolved at the earliest possible stage of litigation. Hunter v. Bryant, 502 U.S. 224, 227 (1991). However, the Ninth Circuit has stated that "[d]etermining claims of qualified immunity at the motion-to-dismiss stage raises special problems for legal decision making." Keates v. Koile, 883 F.3d 1228, 1234 (9th Cir. 2018). "When, as here, defendants assert qualified immunity in a motion to dismiss under Rule 12(b)(6), dismissal is not appropriate unless we can determine, based on the complaint itself, that qualified immunity applies." O'Brien, 818 F.3d at 936 (citation and internal quotation marks omitted). "Thus, the plaintiff is entitled to all reasonable inferences from the facts alleged, not only those that support his claim, but also those that defeat the immunity defense." McKenna v. Wright, 386 F.3d 432, 436 (2d Cir. 2004). "If the operative complaint 'contains even one allegation of a harmful act that would constitute a violation of a clearly established constitutional right,' then plaintiff[ is] 'entitled to go forward' with [his] claims." Keates, 883 F.3d at 1235 (quoting Pelletier v. Fed. Home Loan Bank of San Francisco, 968 F.2d 865, 872 (9th Cir. 1992)).

The Court finds Plaintiff has alleged sufficient facts concerning the failure to adhere to a court order of release despite alleged repeated protests from Plaintiff that the court order entitled him to immediate release, and sufficient facts concerning a potential failure to investigate. In holding that there was no clearly established right under the Fourth Amendment against overdetention, the Ninth Circuit noted "our cases provide some support for a due process or Eighth Amendment right against overdetention." Beckstrand v. Read, 563 F. App'x 533, 534 (9th Cir. 2014) (citing Haygood, 769 F.2d 1350); see also Gillum v. Owens, No. 219CV01859RSMBAT, 2020 WL 6162854, at *3 (W.D. Wash. Sept. 25, 2020) (denying qualified immunity at summary judgment stage based on allegations that defendants violated his constitutional rights when, in contradiction to two orders of temporary release, they continued to

1   detain him on a Snohomish County hold and did not transport him within a reasonable time to

2   address the Snohomish County matter."), report and recommendation adopted, No.

3   219CV01859RSMBAT, 2020 WL 6158980 (W.D. Wash. Oct. 21, 2020); Traweek, 414 F. Supp.

4   3d 847 at 866.

5           The Court finds the allegations here involving a court order mandating immediate release

6   and Plaintiff's daily complaints and protests based on such court order, signify this case is

7   distinguishable to those where courts have found qualified immunity to apply to instances of

8   overdetention.  The court's granting of qualified immunity in Miller v. Thomas is instructive in

9   its comparison to Haygood and Alexander:

> It was not clearly established in this case that Warden Thomas had a duty to
> investigate plaintiff's overdetention claim based on his sole complaint at standing
> mainline, because the complaint was not a "reasonable request" under established
> Ninth Circuit law. Unlike in *Haygoog* and *Alexander,* plaintiff did not present
> Warden Thomas with verified court documents or other proof in support of his
> allegation that his sentence had been miscalculated. Nor did plaintiff follow up
> with Warden Thomas in writing subsequent to his informal verbal complaint. For
> these reasons, it was not 'sufficiently clear' that Warden Thomas had a duty to
> investigate plaintiff's claim such that a reasonable officer would understand that
> his failure to do so in the circumstances would have violated Mr. Miller's
> constitutional rights. *Alston,* 663 F.3d at 1098 (quoting *Anderson v. Creighton,*
> 483 U.S. 635, 640 (1987)). Therefore, I grant Warden Thomas qualified immunity
> to the extent that plaintiff is arguing that the warden had a duty to investigate
> plaintiff's allegation of overdetention based solely on his informal verbal
> complaint. However, I will allow plaintiff to amend his complaint pursuant to
> Fed.R.Civ.P. 15(a)(2) if he feels that he is able to sufficiently plead some factual
> basis under *Iqbal/Twombly* for imputing the actions of Does 1–3 to Warden
> Thomas.

20   Miller v. Thomas, No. 3:10-CV-00376-HU, 2012 WL 1941738, at *3 (D. Or. May 23, 2012).

21   The Court finds the court order and allegations of daily complaints are sufficient to make this

22   case more in line with the failure to investigate in Haygoood and Alexander.  See Haygood, 769

23   F.2d at 1357–58; Alexander, 916 F.2d at 1398.

24           Defendants may very well be able to establish qualified immunity at the summary

25   judgment stage.  See West v. Tillman, 496 F.3d 1321, 1327 (11th Cir. 2007) (where jail inmates

26   brought suit against a sheriff and jail employees alleging Fourteenth Amendment due process

27   violations when the jail failed to properly process court orders authorizing their release from

28   custody, upholding the district court's granting of defendants' motion for summary judgment

based on qualified immunity, explaining the Fourteenth Amendment analysis for over-detention of inmates requires a plaintiff to demonstrate that the defendant acted with deliberate indifference to his or her due process rights, as human error does not equal deliberate indifference.").

For these reasons, as well as the allegations and case law discussed above in Sections III(A) and (B), the Court finds the facts alleged in the second amended complaint state a plausible claim that Defendants violated the clearly-established right to be processed and released within a reasonable time after the time for detention has ended, and to investigate claims of overdetention where such duty exists. Accordingly, the Court recommends the District Judge deny Defendants' motion to dismiss based on qualified immunity.

### D. The Court Recommends Granting Defendants' Motion to Dismiss Plaintiff's State Law Damages Claims for Failure to Comply with the California Government Claims Act

Plaintiff's second, third, fourth, and sixth causes of action allege California state law violations. Specifically, Plaintiff's second cause of action is for violation of the California Constitution, the third cause of action is for negligence, the fourth cause of action is for false imprisonment, and the sixth cause of action is for vicarious liability. (SAC ¶¶ 62-81, 87-89.)

Defendants argue that Plaintiff's tort claim as submitted is flawed on two fronts under the California Government Claims Act: (1) it was untimely based on accrual; and (2) it was filed with the agency only after filing this lawsuit. As for the presentation of the claim being untimely, Defendants proffer that the allegations against the County Defendants stem from events that occurred between December 13, 2019 (the court hearing) and December 18, 2019, the date on which Plaintiff was transported back to CDCR custody (SAC ¶¶ 32-35, 38, 40, 41, 42). Because Plaintiff filed his tort claim with Stanislaus County on June 23, 2020, more than six months after his cause of action against the County Defendants accrued, Defendants submit the state law claims are barred. (Mot. 17.) Defendants further argues that Plaintiff failed to file a tort claim and await a response from Stanislaus County (or await the time frame for a response to expire) prior to filing this action, and therefore, all state law claims, including the second, third,

fourth and sixth causes of action, must be dismissed.

Plaintiff responds that Defendants are not using the proper claim accrual date, as accrual under the CTCA tracks standard California law for claim-accrual, and in California, a cause of action for false imprisonment accrues on the date of release from the confinement.

It appears that Plaintiff's argument regarding the accrual date of a false imprisonment claim has merit,[9] however, the Court finds it unnecessary to address the accrual aspect of the dispute, as the Court finds Defendants' motion to dismiss should be granted on the more narrow ground of Plaintiff's failure to comply with the requirement of the California Government Claims Act to file a claim with the agency *prior* to filing this lawsuit.  Plaintiff's opposition wholly fails to specifically respond to Defendants' argument that Plaintiff's failure to timely submit a claim prior to the filing of this lawsuit is fatal to the state law claims, and instead only focused on the accrual date aspect of Defendants' motion.  (Opp'n 9-10; Reply 7-8.)  The Court finds the relevant caselaw demonstrates that Plaintiff's failure to present the claim prior to filing this lawsuit is fatal to the state law claims, despite the fact the complaint was amended to allege that the claim was filed with the agency, admittedly after the initial filing date.  Plaintiff's opposition does not provide any argument or support for the contrary position.

The filing of a timely claim with the public entity is a condition precedent to the filing of a lawsuit against a public entity or its employees.  Le Mere v. L.A. Unified School Dist., 35 Cal.App. 5th 237, 246 (Cal. Ct. App. 2019) (The Government Claims Act "establishes certain conditions precedent to the filing of a lawsuit against a public entity . . . a plaintiff must timely file a claim for money or damages with the public entity . . . [and] [t]he failure to do so bars the plaintiff from bringing suit against that entity.") (internal citations omitted).  "Timely claim presentation is not merely a procedural requirement, but is a condition precedent to the claimant's ability to maintain an action against the public entity, and "[o]nly after the public entity's board has acted upon or is deemed to have rejected the claim may the injured person

---

[9]  See Pontillo v. Stanislaus Cty., No. 116CV01834DADSKO, 2017 WL 3394126, at *4 (E.D. Cal. Aug. 8, 2017); Pinon-Gutierrez v. California Highway Patrol, No. 2:15-CV-00343-KJM-AC, 2015 WL 5173068, at *3 (E.D. Cal. Sept. 3, 2015).

bring a lawsuit alleging a cause of action in tort against the public entity." Id. (internal citations omitted); Mangold v. California Pub. Utilities Comm'n, 67 F.3d 1470, 1477 (9th Cir. 1995) ("The California Tort Claims Act requires, as a condition precedent to suit against a public entity, the timely presentation of a written claim and the rejection of the claim in whole or in part [and] [w]here compliance with the Tort Claims Act is required, the plaintiff must allege compliance or circumstances excusing compliance, or the complaint is subject to general demurrer.") (internal citations and quotation marks omitted); Karim-Panahi v. Los Angeles Police Dep't, 839 F.2d 621, 627 (9th Cir. 1988) (noting caselaw directing dismissal of claims against public employees working under express or implied authority, notwithstanding wrongful nature of act, when not presented prior to lawsuit, holding "Karim–Panahi's pendent state law tort claims against both the individual and public entity defendants are barred unless he presented them to the City and the LAPD before commencing suit."); State of California v. Superior Court, 32 Cal. 4th 1234, 1243, 90 P.3d 116, 122 (2004) ("In light of this overwhelming case law and history, we conclude that a plaintiff must allege facts demonstrating or excusing compliance with the claim presentation requirement. Otherwise, his complaint is subject to a general demurrer for failure to state facts sufficient to constitute a cause of action.").

Plaintiff initially filed this action on June 22, 2020, and although the complaint named some different defendants, it contained the same causes of actions and named the relevant state agencies and Sheriff Dirkse.  (ECF No. 1.)[10]  As alleged in the second amended complaint filed October 14, 2020, Plaintiff did not submit a tort claim to the CDCR and Sheriff's office until June 23, 2020, and did not receive a response from the Stanislaus Sheriff's office, through the Board of Supervisors of the County of Stanislaus, until August 6, 2020.  (SAC ¶¶ 55, 57, ECF No. 31.)

The Court finds the failure to file a claim to the state agency prior to the filing of this

---

[10]  Plaintiff's original complaint named Ralph Diaz in an official capacity as secretary of the CDCR, Jeff Dirske in an official and individual capacity, the CDCR, and Stanislaus County Sheriff's Department.  (ECF No. 1 at 1, 3.) The complaint brings the same cause of action as the second amended and operative complaint: (1) violation of the Fourteenth Amendment; (2) violation of Article I, Section 7 of the California Constitution; (3) negligence; (4) false imprisonment; (5) Monell and failure to train and supervise; and (6) vicarious liability.  (ECF No. 1 at 8-12.)

1  lawsuit, is fatal to Plaintiff's state law claims for damages.  "The timely presentation of a claim

2  under the Government Claims Act is not merely a procedural requirement, 'it is an actual

3  element of the plaintiff's cause of action[,]' [and] [a]s such, in the complaint, the plaintiff 'must

4  allege facts demonstrating or excusing compliance with the claim presentation requirement.' "

5  Jadwin v. Cty. of Kern, No. 1:07CV00026-OWWDLB, 2009 WL 926844, at *8 (E.D. Cal. Apr.

6  3, 2009) (first quoting Shirk v. Vista Unified Sch. Dist., 42 Cal.4th 201, 209, 64 Cal.Rptr.3d 210,

7  164 P.3d 630 (2007); then quoting State v. Superior Court (Bodde), 32 Cal.4th 1234, 1243, 13

8  Cal.Rptr.3d 534, 90 P.3d 116 (2004)).

9       Le Mere is instructive of a more extreme example where the claim to the agency was not

10  filed until a year after the initial complaint.  In Le Mere, both the initial complaint and the FAC

11  did not allege compliance with the Government Claims Act, while the second amended

12  complaint alleged a government claim was not filed with LAUSD until one year after appellant

13  filed the original complaint, and several months after filing the first amended complaint.  35 Cal.

14  App. 5th at 246.  The appeals court held that plaintiff was required to file a claim "before filing

15  her lawsuit . . . [she] failed to do so," and the action was "therefore barred."  Id. at 247.  The

16  court's discussion regarding the ability to cure a failure to file a pre-lawsuit claim is particularly

17  significant to considering the situation here:

18       Appellant has not cited nor are we aware of any cases permitting a plaintiff to
         "cure" her failure to file a pre-lawsuit claim by filing a post-lawsuit claim,
19       particularly when the claim is filed a year after the lawsuit had commenced. At
         that point, it is too late to " ' "provide the public entity sufficient information to
20       enable it to adequately investigate claims and to settle them, if appropriate,
         without the expense of litigation." ' " (See J.J. v. County of San Diego, supra, 223
21       Cal.App.4th at p. 1219, 167 Cal.Rptr.3d 861.)

22       Relying on Murray v. Oceanside Unified School Dist. (2000) 79 Cal.App.4th
         1338, 95 Cal.Rptr.2d 28 (Murray), appellant maintains that a government claim
23       may be filed after a lawsuit against a public entity begins. Appellant's reliance on
         Murray is misplaced. In Murray plaintiff filed a timely pre-litigation claim which
24       the public entity rejected; she then commenced legal action. (Id. at p. 1345, 95
         Cal.Rptr.2d 28.) She was later permitted to amend her properly filed complaint to
25       add post-complaint misconduct. (Ibid.) That is not the situation here. The public
         entity in Murray had the opportunity to settle Murray's claims without litigation;
26       LAUSD never had that opportunity here.

27  Le Mere, 35 Cal. App. 5th at 247; see also Jadwin v. Cty. of Kern, No. 1:07CV00026-

28  OWWDLB, 2009 WL 926844, at *16–17 (E.D. Cal. Apr. 3, 2009) ("Even though Plaintiff's

1   Second Amended Complaint was filed well after Plaintiff actually submitted his supplemental
2   claim to the County, the presentation of a timely claim is (and was) a substantive 'element' of
3   Plaintiff's new whistleblower claims.  [citation]  At the time Plaintiff filed his initial Complaint,
4   one of the necessary elements of his new whistleblower claims was missing—he had not
5   presented any claim including them [and this] substantive defect in Plaintiff's initial Complaint
6   was not remedied by later pleadings, including his Second Amended Complaint."); Harvey v.
7   City of S. Lake Tahoe, No. CIV S-10-1653 KJM, 2011 WL 3501687, at *9 (E.D. Cal. Aug. 9,
8   2011) ("Furthermore, even if plaintiff did present claims to the police department on July 8,
9   2010, . . . he did so *after* the date on which he filed the initial complaint in this action, June 29,
10  2010, [and] [t]hough plaintiff subsequently filed a first amended complaint on September 20,
11  2010, well after the date he argues he filed a claim with the police department, his cause of
12  action would not have accrued until *after* filing the original complaint in this case [and] Plaintiff
13  may not recover from this defect in later pleadings."), report and recommendation adopted, No.
14  CIV S-10-1653 KJM, 2011 WL 4543195 (E.D. Cal. Sept. 27, 2011); Santa Ana Police Officers
15  Ass'n v. City of Santa Ana, No. SACV151280DOCDFMX, 2016 WL 11507032, at *5 (C.D.
16  Cal. Feb. 1, 2016) ("In this case, Plaintiffs submitted their first claim to the City of Santa Ana on
17  February 27, 2015 . . . Plaintiffs filed the original Complaint in state court on January 22, 2014 –
18  over a year *prior* to the date they presented a claim to the City . . . Therefore, Plaintiffs' first,
19  fourth, and fifth causes of action are barred.").

20      The Court notes that while Plaintiff alleges he filed his lawsuit only one day prior to
21  filing his state tort claim, the relevant agency did not respond until August 6, 2020.  (SAC ¶¶ 55,
22  57.)   Defendants clearly and specifically raised this issue in briefing and Plaintiff has not
23  provided the Court with a specific response nor any case law that would demonstrate a shorter
24  period of time defeats the failure to comply with this condition precedent to filing an action.  At
25  the hearing, Plaintiff offered two arguments as to this issue: (1) that in Le Mere, the claim was
26  both filed after the six month accrual deadline, and the lawsuit was filed before the claim,
27  whereas here, Plaintiff argues the accrual deadline was not expired per the false imprisonment
28  accrual standard cited above; and (2) in federal court, an amended pleading supersedes the

1   original.

2       As for the amended pleading superseding the original in federal court, this Court has

3   applied a similar standard to the Federal Tort Claims Act's exhaustion requirement, rejecting a

4   plaintiff's ability to amend a complaint after the denial of an administrative claim to allege

5   compliance with the exhaustion requirement.   Sparrow v. U.S. Postal Serv., 825 F. Supp. 252,

6   255 (E.D. Cal. 1993) (stating, with respect to the Federal Tort Claims Act, "[i]f the claimant is

7   permitted to bring suit prematurely and simply amend his complaint after denial of the

8   administrative claim, the exhaustion requirement would be rendered meaningless.   Because §

9   2675(a) of the FTCA requires that an administrative claim be finalized at the time the complaint

10  is filed, plaintiff's complaint cannot be cured through amendment, but instead, plaintiff must file

11  a new suit [and] [t]his Court lacks subject matter jurisdiction over the present action, which was

12  commenced before the exhaustion requirement under § 2675(a) was satisfied.").

13      As for Plaintiff's argument that Le Mere is distinguishable, the cases cited above

14  sufficiently demonstrate that the requirement to file the claim prior to the lawsuit, standing alone,

15  is a condition precedent.   Allowing a suit to move forward despite such failure would violate the

16  public policies behind the law.   See, e.g., Ulmschneider v. Stockton Unified Sch. Dist., No.

17  C089601, 2020 WL 6278655, at *7 (Cal. Ct. App. Oct. 27, 2020) (public policy supports strict

18  application of the claims presentation requirements); Willis v. City of Carlsbad, 48 Cal. App. 5th

19  1104, 1119–20, 262 Cal. Rptr. 3d 528, 540–41 (2020) ("Public policy supports the 'strict

20  application' . . . of the claims presentation requirements.") (citation omitted).

21      The Court finds that public policy, as explained in case law, supports dismissing the state

22  damages claims action, and leaving Plaintiff to petition the state court for relief from the statute's

23  requirements.   See Le Mere, 35 Cal. App. 5th at 246 (noting the statute's purpose is not to avoid

24  surprise but "to provide the public entity sufficient information to enable it to adequately

25  investigate claims and to settle them, if appropriate, without the expense of litigation," and

26  stating it "is well-settled that claims statutes must be satisfied even in face of the public entity's

27  actual knowledge of the circumstances surrounding the claim [and] [s]uch knowledge—standing

28  alone—constitutes neither substantial compliance nor basis for estoppel.") (internal citations and

quotation marks omitted); <u>Jadwin</u>, WL 926844, at *16 ("Plaintiff's attempt in his Second

Amended Complaint . . . to assert . . . post-Claim retaliation was advanced by Plaintiff as a basis

for liability in his initial Complaint which he filed before he had submitted any supplemental

claim to the County.  By resorting to litigation first, Plaintiff violated the letter, spirit and

purpose of the Government Claims Act.").[11]

Plaintiff has not presented any argument regarding substantial compliance, and in any

event, that doctrine also does not appear able to cure the issue of a failure to present a claim prior

to instituting an action.  <u>See</u> <u>Santa Ana Police Officers Ass'n</u>, 2016 WL 11507032, at *6, n.4

("[T]he doctrine of substantial compliance cannot save Plaintiffs' failure to submit timely claims

[as] [t]he test for substantial compliance is whether the face of the filed claims disclose sufficient

information to enable the public entity to make an adequate investigation of the claim's merits

and settle it without the expense of litigation.  Because the public entity Defendants were not

given the opportunity to settle and avoid the expenses of litigation – indeed, Plaintiffs engaged in

litigation for a year before presenting any claims – the Court cannot conclude Plaintiffs

substantially complied with the claim presentation requirement.") (internal quotation marks and

citation omitted); <u>see also</u> <u>Harvey</u>, 2011 WL 3501687, at *9 ("Thus, the Court recommends

dismissing the state law claims for damages, with leave only to the extent Plaintiff can allege

compliance with the Government Claims Act on a date prior to the initial filing date of this

action . . . The dismissal will be with leave to amend, to the extent that plaintiff can allege that he

---

[11] The <u>Jadwin</u> court further discusses public policy:

"The legislature's intent to require the presentation of claims *before* suit is filed could not be
clearer." *City of Stockton,* 42 Cal.4th at 746, 68 Cal.Rptr.3d 295, 171 P.3d 20. "Submission of a
claim to a public entity pursuant to [the Act] is a *condition precedent* to a [civil] action." *Javor v.
Taggart,* 98 Cal.App.4th 795, 804, 120 Cal.Rptr.2d 174 (2002) (emphasis added) (alteration in
original) (internal quotation marks omitted). The purpose of the Government Claims Act is "to
provide the public entity sufficient information to enable it to adequately investigate claims and to
settle them, if appropriate, *without the expense of litigation." Stockett,* 34 Cal.4th at 446, 20
Cal.Rptr.3d 176, 99 P.3d 500 (emphasis added) (internal quotation marks omitted). The
Government Claims Act gives "the governmental entity an opportunity to settle just claims *before*
suit is brought" and "enable[s] the public entity to engage in fiscal planning for potential liabilities
and to avoid similar liabilities in the future." *Lozada,* 145 Cal.App.4th at 1151, 52 Cal.Rptr.3d 209
(emphasis added) (internal quotation marks omitted).

<u>Jadwin</u>, 2009 WL 926844, at *16–17.

1    filed claims with the City defendants *prior* to filing suit.") (emphasis in original).

2    Accordingly, the Court recommends granting Defendants' motion to dismiss.  Although

3    it does not appear Plaintiff can cure this defect, the Court recommends granting leave to the

4    extent Plaintiff can plead compliance with the California Government Claims Act prior to filing

5    this action.

6    While Plaintiff's state law claims for damages are precluded for the failure to present the

7    claim to the agency prior to instituting the lawsuit, the Government Claims Act only

8    encompasses claims for damages.  See Robinson v. Alameda Cty., 875 F. Supp. 2d 1029, 1044

9    (N.D. Cal. 2012) ("The filing requirement does not apply to either non-pecuniary actions such as

10   injunctive, specific, or declaratory relief, or causes of action based upon federal law."); Nevarez

11   v. Forty Niners Football Co., LLC, 326 F.R.D. 562, 587 (N.D. Cal. 2018) ("The Claims Act does

12   not apply to actions brought primarily for declaratory or injunctive relief, even though incidental

13   money damages are sought." (internal citation and quotation marks omitted).  Thus, the Court

14   recommends dismissing Plaintiff's second cause of action for violation of the California

15   Constitution to the extent it is seeking damages, the sixth cause of action for vicarious liability,[12]

16   the third cause of action for negligence, and the fourth cause of action for false imprisonment.

17

18   **E.   The Court Recommends Granting Defendants' Motion to Dismiss Plaintiff's Second Cause of Action to the Extent it Seeks Damages**

19   In his Second Cause of Action, Plaintiff McDaniel alleges that his rights under Article I,

20   Section of the California Constitution were violated, and alleges that Defendants' conduct

21   "caused physical, emotional and pecuniary damages."  (SAC ¶¶ 62-65.)  Defendants move to

22   dismiss the second cause of action because there is no right to seek damages under Article I,

23

24   [12] As explained in the next section, the Court recommends Plaintiff's second cause of action for violation of the California Constitution should be dismissed to the extent it seeks damages, but survive the motion to dismiss to the extent it seeks declaratory relief.  Thus, in conjunction, the Court recommends the claim survive to the extent it only seeks declaratory relief.  The Court notes that the complaint states as to the sixth cause of action: "Plaintiff is entitled to declaratory and other relief under this cause of action, not to include compensatory or punitive damages." (SAC ¶ 89.)  It is not clear why Plaintiff specifically put this statement as to the vicarious liability claim, and no party raised the issue of whether this claim would survive seeking only declaratory relief without being tied to the state law negligence and false imprisonment claims that the Court is here recommending dismissal of.  The Court recommends dismissal of the vicarious liability claim outright as inexorably intertwined with these state law tort claims being dismissed, despite this reference to declaratory relief.

section 7 of the California Constitution.  (Mot. 19.)  Plaintiff responds that just because damages are precluded from being directly awarded under the claim does not mean that the claim should be dismissed in its entirety, and specifically: (1) declaratory relief is not barred; and (2) the state constitutional violation is tied to the common law actions of negligence and false imprisonment.[13]  (Opp'n 10.)

Article I, section 7, subdivision (a), of the California Constitution guarantees that: "A person may not be deprived of life, liberty, or property without due process of law or denied equal protection of the laws."  Cal. Const. art. I, § 7(a); Katzberg v. Regents of the University of California, 29 Cal. 4th 300 (Cal. 2002).  Defendants are correct, and Plaintiff concedes, that there is no right to seek damages under this section of the California Constitution.  Katzberg, 29 Cal. 4th at 329; Javor v. Taggart, 98 Cal. App. 4th 795, 807, 120 Cal. Rptr. 2d 174 (2002) ("It is beyond question that a plaintiff is not entitled to damages for a violation of the due process clause or the equal protection clause of the state Constitution.").  However, Plaintiff highlights the following language from Katzberg:

> We do not here consider the propriety of actions such as those based upon grounds established under common law tort principles—for example, actions for false arrest, false imprisonment, wrongful termination based upon violation of public policy, or the like.  In such actions, a breach of duty or violation of public policy may be established by demonstrating a violation of a constitutional provision, and damages properly may be awarded to remedy the tort.  We consider here only whether an action for damages is available to remedy a constitutional violation that is not tied to an established common law or statutory action.

Katzberg, 29 Cal. 4th at 304, n.1.  The Supreme Court of California went on to state: "Furthermore, it also is clear that, like many other constitutional provisions, this section supports an action, brought by a private plaintiff against a proper defendant, for declaratory relief or for injunction."  Id. at 307; see also Pimentel v. City of Los Angeles, No. CV 14-1371 FMO (EX), 2015 WL 13763671, at *8 (C.D. Cal. Sept. 29, 2015) ("As an initial matter, plaintiffs are correct that their cause of action under the California Constitution survives because it seeks declaratory

---

[13]  While the Court recommends dismissal of the state law claims for failure to comply with the Government Claims Act, supra, Section III(D), only claims for monetary damages must be presented under the law.  Thus, although this prong of Plaintiff's argument no longer stands in the face of that recommendation, the Court finds the failure to present the state constitutional claim prior to instituting this lawsuit is not fatal to this claim, to the extent it is not seeking monetary damages.

and injunctive relief."); <u>Weimer v. Cty. of Kern</u>, No. 1:06-CV-00735OWWDLB, 2006 WL 3834237, at *9 (E.D. Cal. Dec. 28, 2006) ("Accordingly, Plaintiff's prayers for damages in connection with his claims under the California Constitution are STRICKEN.  These claims may be re-pled as claims for declaratory relief only in an amendment to the complaint."); <u>Dragasits v. Rucker</u>, No. 18-CV-0512-WQH-AGS, 2020 WL 264519, at *5 (S.D. Cal. Jan. 17, 2020) ("[W]hile his claims for damages under the California Constitution should be dismissed, his claims for any equitable relief should survive. To that extent, defendants' motion to dismiss should be denied."), <u>report and recommendation adopted,</u> No. 318CV00512WQHAGS, 2020 WL 805090 (S.D. Cal. Feb. 13, 2020).

In reply, Defendants submit that to the extent Plaintiff is seeking declaratory relief, any such relief would be moot and speculative as Plaintiff has already been released from custody. (Reply 8.)  However, Defendants cite no authority for this argument.

The Court finds that while Plaintiff may not seek damages pursuant to this cause of action, he may properly seek declaratory relief.  Accordingly, the Court recommends granting Defendants motion to the extent of dismissing Plaintiff's claims for damages pursuant to the second cause of action be dismissed, and denying the motion to the extent Plaintiff's second cause of action for declaratory relief survives.  <u>See</u> <u>Dragasits</u>, <u>report and recommendation adopted,</u> No. 318CV00512WQHAGS, 2020 WL 805090 (granting motion to dismiss count 4 for monetary damages under California Constitution, and denying motion to dismiss count 4 for declaratory and injunctive relief).

### F.    The Court Declines to Make Recommendations Concerning Defendants' Motion to Dismiss the Third and Fourth Causes of Action for Failure to Allege Facts Sufficient to State a Claim

Beyond non-compliance with the California Government Claims Act, Defendants argue Plaintiff's state claims for negligence and false imprisonment fail to allege facts to state a claim.

Given the Court's finding that Plaintiff's state law damages claims are barred due to the failure to present the claims pursuant to the California Government Claims Act prior to instituting this lawsuit, the Court finds it unnecessary to address Defendant's motion to dismiss

1  the state law claims for failure to allege facts sufficient to state a claim.  If the District Judge

2  declines to adopt the recommendation to dismiss the state law claims for failure to comply with

3  the Government Clams Act, <u>supra</u> Section III(D), the undersigned recommends the District

4  Judge refer this motion back to the undersigned for the issuance of further findings and

5  recommendations on this specific issue.  Accordingly, if the District Judge dismisses the third

6  and fourth causes of action on the more narrow ground of failure to comply with the California

7  Government Claims Act, the undersigned recommends denying the motion to dismiss the third

8  and fourth causes of action for failure to allege facts sufficient to state a claim as moot.

9
10  **G.   The Court Declines to Make a Recommendation Concerning Defendants' Motion to Dismiss the Sixth Cause of Action Pursuant to California Government Code Section 820.8 Immunity**

11

12  Defendants argue that Sheriff Dirkse is immune from vicarious liability pursuant to

13  California Government Code section 820.8, <u>Weaver v. State of California</u>, 63 Cal. App.4th 188,

14  202-03 (Cal. Ct. App. 1998), and Dirkse cannot be held liable under a theory of vicarious

15  liability for the alleged acts of other County employees at the jail and the sixth cause of action

16  must be dismissed.  (Mot. 22.)

17  Plaintiff concedes that Defendants are correct that Sheriff Dirkse is immune from

18  vicarious liability in his individual capacity.  (Opp'n 12-13.)  However, Plaintiff emphasizes that

19  he is not suing Defendant Dirkse in an individual capacity but rather in his official capacity as

20  Sheriff of Stanislaus County, (SAC ¶ 88), and thus sued as "the public entity of the Sheriff's

21  Office."  (Opp'n 13.)   Plaintiff highlights California Government Code § 815.2(a) which

22  provides: "A public entity is liable for injury proximately caused by an act or omission of an

23  employee of the public entity within the scope of his employment if the act or omission would,

24  apart from this section, have given rise to a cause of action against that employee or his personal

25  representative."  Cal. Gov't Code § 815.2(a).  Plaintiff thus proffers that the complaint pleads

26  vicarious liability claim properly, as Sheriff Dirkse, in his official capacity as a public entity, is

27  vicariously liable for the acts of Defendants Sousa and Mendez.  In reply, Defendants argue

28  California Government Code section 815.2, cited by Plaintiff in his opposition, provides a

statutory basis for vicarious liability against a public entity, not a public official sued in his "official capacity" as is commonly pleaded in 42 U.S.C. section 1983 claims.  (Reply 11.) Defendants provided no specific authority supporting this distinction.[14]  (Id.)

Given the Court's finding that Plaintiff's state law damages claims are barred due to the failure to present the claims pursuant to the California Government Claims Act prior to instituting this lawsuit, the Court finds it unnecessary to address Defendant's motion to dismiss the sixth cause of action for immunity.  If the District Judge declines to adopt the recommendation to dismiss the state law claims for failure to comply with the Government Clams Act, supra Section III(D), the undersigned recommends the District Judge refer this motion back to the undersigned for the issuance of further findings and recommendations on this specific issue.  The Court notes it is inclined to order supplemental briefing given the absence of clear case law in the area provided by the parties, and the fact that the Court's research has located potentially opposing discussions from this district on this issue.  Compare Mock v. California Dep't of Corr. & Rehab., No. 1:15-CV-01104-MJS, 2015 WL 5604394, at *10 (E.D. Cal. Sept. 23, 2015) ("Defendants move for the dismissal of Defendant Beard with prejudice because there are no charging allegations as to him individually and because he cannot be held liable for the alleged wrongs of other public employees.  This argument is innapposite [sic] since Beard is named in his official capacity only, and Section 820.8's restrictions on individual liability do not apply."), with Fetter v. Bonner, No. 2:12-CV-2235-GEB-EFB, 2015 WL 164268, at *6–7 (E.D. Cal. Jan. 13, 2015) ("Sheriff Bonner seeks dismissal of Plaintiff's negligence, negligent hiring and supervision, and negligent infliction of emotional distress claims alleged against him in his individual and official capacities, arguing each is based on the alleged conduct of his subordinates for which he 'cannot be liable under Gov.Code § 820.8(a)(2).'  . . . Concerning Plaintiff's negligence and negligent infliction of emotional distress claims, Plaintiff

---

[14]  The Court notes it is clear that in a Section 1983 action, a suit against a state official in an official capacity is a suit against the state.  See Will v. Michigan Dep't of State Police, 491 U.S. 58, 71, 109 S. Ct. 2304, 2312, 105 L. Ed. 2d 45 (1989) ("Obviously, state officials literally are persons.  But a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office."); McCoy v. Los Angeles Cty. Sheriff's Dep't, No. CV 09-0093-GHK DTB, 2010 WL 330235, at *8 (C.D. Cal. Jan. 18, 2010) (noting an "official-capacity suit is, in all respects other than name, to be treated as a suit against the entity.").

1  does not allege that Sheriff Bonner was personally involved with his injuries alleged in these

2  claims.  Therefore, these claims are dismissed.  However, Plaintiff does allege in his negligent

3  supervision, training, hiring and retention claim alleges that Sheriff Bonner is [directly liable for

4  his own negligence] . . . [h]owever, these conclusory allegations do not support drawing a

5  reasonable inference that Sheriff Bonner is liable for this claim and it is therefore dismissed.")

6          Accordingly, if the District Judge dismisses the sixth cause of action on the more narrow

7  ground of failure to comply with the California Government Claims Act, supra Section III(D),

8  the undersigned recommends denying Defendants' motion to dismiss the sixth cause of action

9  due to immunity, as moot.

10

11  ### H.    The Court Recommends Defendants' Motion to Dismiss Plaintiff's Claim for Punitive Damages be Denied

12         Defendants argue that the allegations set forth in the SAC are insufficient to support

13  Plaintiff's prayer for exemplary/punitive damages against the County Defendants, as no

14  intentional or malicious wrongful action is alleged on the part of Sheriff Dirkse, Henry Mendez,

15  or Sgt. Jose Sousa.  (Mot. 23.)

16         Plaintiff responds that the complaint does allege intentional wrongful action in that it

17  alleges Mendez and Sousa were subjectively aware of Judge Ashley's immediate release order

18  but chose to follow the CDCR's request instead (SAC ¶ 41).  (Opp'n 13.)  Plaintiff contends that

19  the intentional choice brings the County Defendants within the scope of criminal punishment

20  under California Penal Code § 166, which punishes the willful disobedience of terms of a court

21  order, or for contempt proceedings, Application of Burns, 161 Cal. App. 2d 137, 142, 326 P.2d

22  617, 620 (1958) ("We would not construe 'willful' as pertaining to contempt as meaning only a

23  deliberate intention to disregard a court order, but rather as encompassing an indifferent

24  disregard of the duty to obey it promptly.").  (Opp'n 13-14.)  Plaintiff argues the complaint

25  clearly alleges Mendez and Sousa acted recklessly with regard to his right to freedom, and it is

26  thus not out of the question that punitive damages are unavailable as "willfulness" is not a strict

27  requirement for punitive damages under Section 1983, and a reckless indifference to

28  constitutional rights is sufficient.  (Opp'n 14.)

Plaintiff's opposition brief does not appear to address Defendant Dirkse and Defendants' argument that he did not have any personal participation that would warrant the imposition of punitive damages. Neither sides seems to recognize that the complaint does not seek punitive damages against Defendant Dirkse. In fact, the complaint expressly states Plaintiff seeks: "Exemplary and/or punitive damages from all Defendants except [Dirkse." (SAC ¶ 91.)

Federal courts in California "have reached different results as to the pleading standards that apply when testing a prayer for punitive damages on a motion to dismiss." Villareal v. City of Indio, No. EDCV1600141JAKDTBX, 2016 WL 6678010, at *10 (C.D. Cal. June 20, 2016) (collecting cases) (citing Kelley v. Corr. Corp. of Am., 750 F. Supp. 2d 1132, 1147 (E.D. Cal. 2010) ("Although some courts in this circuit have expressed some reservation in applying the pleading standards set forth in *Twombly* and *Iqbal* to claims for punitive damages . . . this court can see no basis for such reservation.").[15] Even under the heightened pleading expressed since Twombly and Iqbal, the Court finds Defendants have not met their burden of demonstrating Plaintiff's claims for punitive damages against Defendants and Mendez should be dismissed.

The cases proffered by Defendants are not convincing.[16] A "jury may award punitive damages under Section 1983 either when a defendant's conduct was driven by evil motive or intent, or when it involved a reckless or callous indifference to the constitutional rights of others." Dang v. Cross, 422 F.3d 800, 807 (9th Cir. 2005) (quoting Morgan v. Woessner, 997

---

[15] The Court notes that in the context of obtaining discovery of financial information pertinent to punitive damages, a majority of federal courts hold do not require a *prima facie* showing of an entitlement to punitive damages. See U.S. E.E.O.C. v. Giumarra Vineyards Corp., No. 1:09-CV-02255-AWI, 2012 WL 393333, at *2 (E.D. Cal. Feb. 6, 2012); Bakersfield Pipe & Supply, Inc. v. Cornerstone Valve, LLC, No. 1:14-CV-01445-JLT, 2016 WL 3538251, at *4 (E.D. Cal. June 29, 2016).

[16] Parker involved only the California state law standard for punitive damages, and a complaint devoid of relevant factual allegations. Parker v. Fid. Sec. Life Ins. Co., No. CIV. F 06-654 AWI DL, 2006 WL 2190956, at *6 (E.D. Cal. Aug. 1, 2006) ("The only factual allegations in the complaint, beyond that Plaintiff suffered a loss and Defendant refused to pay, are in paragraph 17 [alleging] that Plaintiff provided Defendant with the decedent's medical records, a report from Dr. Brandon E. Boggs, and toxicology reports, but that Defendant ignored all of these submissions . . . To obtain punitive damages under California law, a plaintiff must show that a defendant engaged in malice, fraud, or oppression . . . However, there are no specific allegations of malice, fraud, or oppression, and, even viewed in the light most favorable to Plaintiff, the facts that are alleged in the complaint are not enough support a claim for punitive damages."). Whittlestone was only cited for the proposition that a motion to dismiss is proper to challenge precluded damages, but did not involve punitive damages. Whittlestone, Inc. v. Handi-Craft Co., 618 F.3d 970, 974–75 (9th Cir. 2010).

1   F.2d 1244, 1255 (9th Cir. 1993).  Although not abundantly clear, Plaintiff alleges at a minimum

2   that Defendants Mendez and Sousa made the intentional choice to follow the instructions from

3   the CDCR rather than the dictate of the court order on December 15, 2019, and Defendants were

4   informed by Plaintiff on a daily basis that he was supposed to be released, until he was

5   transferred on December 18, 2019.  (SAC ¶¶ 40-44.)  The Court finds these allegations are

6   sufficient to survive Defendants' motion to dismiss.  See Grizzle v. Cty. of San Diego, No.

7   317CV00813JLSRBM, 2020 WL 3961619, at *11 (S.D. Cal. July 10, 2020) ("Plaintiff alleges

8   that, despite complaining verbally and in writing concerning his Ad-Seg confinement and the

9   conditions of confinement, the Individual Defendants failed to take any action to rectify the

10  issues [and] [a]t the pleading stage, this suffices to show reckless/callous indifference to

11  Plaintiff's rights under the Fourteenth Amendment."), report and recommendation adopted, No.

12  17-CV-813 JLS (RBM), 2020 WL 4746211 (S.D. Cal. Aug. 17, 2020); Panoyan v. Regalo Int'l

13  LLC, No. CV 19-07469 PA (SKX), 2019 WL 8758897, at *4 (C.D. Cal. Oct. 25, 2019) (in

14  applying the California standard, finding "Plaintiffs have complied with Federal Rules 8 and 9

15  because they have clearly requested punitive damages and made allegations that Defendant 'did

16  engage in reckless conduct with malice, oppression, or fraud,' . . . [and] [w]hether Defendant's

17  conduct does in fact rise to a level that justifies punitive damages is an issue that must remain

18  unresolved at this stage of the litigation [and rather] if Plaintiffs are unable to support their

19  allegations with probative evidence, their punitive damages claim may later fail either on a

20  motion for summary judgment or at trial."); Villareal v. City of Indio, No.

21  EDCV1600141JAKDTBX, 2016 WL 6678010, at *10 (C.D. Cal. June 20, 2016) ("Although

22  these allegations are sparse, little purpose would be served by assessing this issue in detail at this

23  stage of the proceeding.  The FAC alleges that Perafan shot Decedent '[w]ithout warning or

24  probable cause ... provocation, necessity, or justification.' [ . . . ] Whether the evidence, if any,

25  that is developed as this matter proceeds will be sufficient to support these allegations is a matter

26  that can be properly addressed once it is assembled.").

27          Accordingly, the Court recommends denying Defendants' motion to dismiss Plaintiff's

28  claims for punitive damages against Defendant Dirkse as moot, given the complaint expressly

57

states that Plaintiff is not seeking punitive or exemplary damages from Defendant Dirkse.  The Court also recommends denying Defendants' motion to dismiss Plaintiff's punitive damages claims against Defendants Mendez and Sousa.

## I.      Leave to Amend

While Defendants did not address whether Plaintiff's should be allowed leave to amend as to the individual causes of action, Defendants conclude the motion stating the County Defendants request they be dismissed from the action without leave to amend.  (Mot. 23.)

Courts freely grant leave to amend a complaint which has been dismissed.  See Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave when justice so requires."); Schreiber Distrib. Co. v. Serv-Well Furniture Co., 806 F.2d 1393, 1401 (9th Cir. 1986) ("If a complaint is dismissed for failure to state a claim, leave to amend should be granted unless the court determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency."); Lopez v. Smith, 203 F.3d 1122, 1130 (9th Cir. 2000) (same).

The Court recommends granting leave to amend the first cause of action and/or the fifth cause of action to attempt to state a claim against Dirkse in an individual capacity, to the extent Plaintiff believes in good faith he is able to do so.  The Court recommends granting leave to amend and replead the third cause of action for negligence, fourth cause of action for false imprisonment, and the sixth causes of action for vicarious liability, recommended to be dismissed for failure to comply with the California Government Claims Act, only to the extent Plaintiff is able to plead facts demonstrating the submission of the complaint and response to the agency prior to filing this action.  See Harvey, 2011 WL 3501687, at *9 ("Thus, the Court recommends dismissing the state law claims for damages, with leave only to the extent Plaintiff can allege compliance with the Government Claims Act on a date prior to the initial filing date of this action . . . The dismissal will be with leave to amend, to the extent that plaintiff can allege that he filed claims with the City defendants *prior* to filing suit.") (emphasis in original).

/ / /

/ / /

/ / /

# V.

## CONCLUSION AND RECOMMENDATION

Based on the foregoing, IT IS HERBY RECOMMENDED that the Defendants' motion to dismiss be GRANTED IN PART AND DENIED IN PART as follows:

1.     Defendants' motion to dismiss Plaintiff's first cause of action against Defendant Dirkse be GRANTED with leave to amend;

2.     Defendants' motion to dismiss Plaintiff's first cause of action against Defendants Mendez and Sousa be DENIED;

3.     Defendants' motion to dismiss Plaintiff's fifth cause of action be DENIED as to Dirkse in an official capacity;

4.     Defendants' motion to dismiss Plaintiff's fifth cause of action be GRANTED as to Dirkse in an official capacity with leave to amend;

5.     Defendants' motion to dismiss Dirkse, Sousa, and Mendez as entitled to qualified immunity be DENIED;

6.     Defendants' motion to dismiss Plaintiff's state law claims for failure to comply with the California Government Claims Act be GRANTED in the following manner:

    a.     Plaintiff's second cause of action for violation of the California Constitution be dismissed to the extent it is seeking damages;

    b.     Plaintiff's sixth cause of action for vicarious liability be dismissed;

    c.     Plaintiff's third cause of action for negligence be dismissed;

    d.     Plaintiff's fourth cause of action for false imprisonment be dismissed;

7.     Defendants' motion to dismiss Plaintiff's second cause of action be GRANTED to the extent it is seeking damages[17];

8.     Defendants' motion to dismiss Plaintiff's third and fourth causes of action for failure to allege facts sufficient to state a claim be DENIED as moot;

---

[17]   Alternatively, the Court may deny the motion as moot given the recommendation to dismiss the monetary damages under the cause of action for failure to comply with the Government Claims Act.

1    9.   Defendants' motion to dismiss Plaintiff's sixth cause of action for immunity

2         pursuant to California Government Code Section 820.8, be DENIED as moot; and

3    10.  Defendants' motion to dismiss Plaintiff's claim for punitive damages be DENIED

4         as moot as to Dirkse, and DENIED on the merits as to Mendez and Sousa.

5    This findings and recommendations is submitted to the district judge assigned to this

6    action, pursuant to 28 U.S.C. § 636(b)(1)(B) and this Court's Local Rule 304.  Within **fourteen**

7    **(14) days** of service of this recommendation, any party may file written objections to this

8    findings and recommendations with the court and serve a copy on all parties.  Such a document

9    should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  The

10   district judge will review the magistrate judge's findings and recommendations pursuant to 28

11   U.S.C. § 636(b)(1)(C).  The parties are advised that failure to file objections within the specified

12   time may result in the waiver of rights on appeal.  Wilkerson v. Wheeler, 772 F.3d 834, 839 (9th

13   Cir. 2014) (citing Baxter v. Sullivan, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated:   **December 17, 2020**

UNITED STATES MAGISTRATE JUDGE

60